UNITED STATES *v.* SEALY, INC.

No. 9.   Argued April 20, 1967.—Decided June 12, 1967.

*Daniel M. Friedman* argued the cause for the United States.   On the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Richard A. Posner* and *Robert B. Hummel.*

*Richard W. McLaren* argued the cause for appellee. With him on the brief were *John T. Chadwell, Richard S. Rhodes* and *David L. Aufderstrasse.*

*Sigmund Timberg* and *Lionel G. Gross* filed a brief for Serta Associates, Inc., et al., as *amici curiae,* urging affirmance.

*Carlton Hill* filed a brief for the Restonic Corporation, as *amicus curiae.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

Appellee and its predecessors have, for more than 40 years, been engaged in the business of licensing manufacturers of mattresses and bedding products to make and sell such products under the Sealy name and trademarks. In this civil action the United States charged that appellee had violated § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, by conspiring with its licensees to fix the prices at which the retail customers of the licensees might resell bedding products bearing the Sealy name, and to allocate mutually exclusive territories among such manufacturer-licensees.

After trial, the District Court found that the appellee was engaged in a continuing conspiracy with its manufacturer-licensees to agree upon and fix minimum retail prices on Sealy products and to police the prices so fixed. It enjoined the appellee from such conduct, "Provided, however, that nothing herein contained shall be construed to prohibit the defendant from disseminating and using suggested retail prices for the purpose of national advertising of Sealy products." Appellee did not appeal the finding or order relating to price-fixing.

With respect to the charge that appellee conspired to allocate mutually exclusive territory among its manufacturers, the District Court held that the United States had not proved conduct "in unreasonable restraint of

trade in violation of Section 1 of the Sherman Act." The United States appealed under § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29. We noted probable jurisdiction. 382 U. S. 806 (1965).

There is no dispute that exclusive territories were allotted to the manufacturer-licensees. Sealy agreed with each licensee not to license any other person to manufacture or sell in the designated area; and the licensee agreed not to manufacture or sell "Sealy products" outside the designated area. A manufacturer could make and sell his private label products anywhere he might choose.

Because this Court has distinguished between horizontal and vertical territorial limitations for purposes of the impact of the Sherman Act, it is first necessary to determine whether the territorial arrangements here are to be treated as the creature of the licensor, Sealy, or as the product of a horizontal arrangement among the licensees. *White Motor Co.* v. *United States,* 372 U. S. 253 (1963).

If we look at substance rather than form, there is little room for debate. These must be classified as horizontal restraints. Compare *United States* v. *General Motors,* 384 U. S. 127, 141–148 (1966); *id.,* at 148–149 (HARLAN, J., concurring in the result); *United States* v. *Parke, Davis & Co.,* 362 U. S. 29 (1960).

There are about 30 Sealy "licensees." They own substantially all of its stock.[1] Sealy's bylaws provide that each director must be a stockholder or a stockholder-licensee's nominee. Sealy's business is managed and controlled by its board of directors. Between board meetings, the executive committee acts. It is composed of Sealy's president and five board members, all licensee-

---

[1] A nonlicensee, Bergmann, who was Sealy's president in the 1950's, owns some of the remaining stock; stockholders have preemptive rights.

stockholders. Control does not reside in the licensees only as a matter of form. It is exercised by them in the day-to-day business of the company including the grant, assignment, reassignment, and termination of exclusive territorial licenses. Action of this sort is taken either by the board of directors or the executive committee of Sealy, both of which, as we have said, are manned, wholly or almost entirely, by licensee-stockholders.

Appellee argues that "there is no evidence that Sealy is a mere creature or instrumentality of its stockholders." In support of this proposition, it stoutly asserts that "the stockholders and directors wore a 'Sealy hat' when they were acting on behalf of Sealy." But the obvious and inescapable facts are that Sealy was a joint venture of, by, and for its stockholder-licensees; and the stockholder-licensees are themselves directly, without even the semblance of insulation, in charge of Sealy's operations.

For example, some of the crucial findings of the District Court describe actions as having been taken by "stockholder representatives" acting as the board or a committee.

It is true that the licensees had an interest in Sealy's effectiveness and efficiency, and, as stockholders, they welcomed its profitability—at any rate within the limits set by their willingness as licensees to pay royalties to the joint venture. But that does not determine whether they as licensees are chargeable with action in the name of Sealy. We seek the central substance of the situation, not its periphery;[2] and in this pursuit, we are moved by the identity of the persons who act, rather than the label of their hats. The arrangements for

---

[2] Cf., *e. g.*, *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593 (1951); *United States* v. *General Motors,* 384 U. S. 127 (1966); *United States* v. *New Wrinkle, Inc.,* 342 U. S. 371 (1952); *United States* v. *American Tobacco Co.,* 221 U. S. 106 (1911).

exclusive territories are necessarily chargeable to the licensees of appellee whose interests such arrangements were supposed to promote and who, through select members, guaranteed or withheld and had the power to terminate licenses for inadequate performance. The territorial arrangements must be regarded as the creature of horizontal action by the licensees. It would violate reality to treat them as equivalent to territorial limitations imposed by a manufacturer upon independent dealers as incident to the sale of a trademarked product. Sealy, Inc., is an instrumentality of the licensees for purposes of the horizontal territorial allocation. It is not the principal.

Accordingly, this case is to be distinguished from *White Motor Co.* v. *United States, supra,* which involved a vertical territorial limitation. In that case, this Court pointed out that vertical restraints were not embraced within the condemnation of horizontal territorial limitations in *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593 (1951), and, prior to trial on summary judgment proceedings, the Court declined to extend *Timken* "to a *vertical* arrangement by one manufacturer restricting the territory of his distributors or dealers." 372 U. S., at 261.

*Timken* involved agreements between United States, British, and French companies for territorial division among themselves of world markets for antifriction bearings. The agreements included fixing prices on the products of one company sold in the territory of the others; restricting imports to and exports from the United States; and excluding outside competition. This Court held that the "aggregation of trade restraints such as those existing in this case are illegal under the [Sherman] Act." 341 U. S., at 598.

In the present case, we are also faced with an "aggregation of trade restraints." Since the early days of the

company in 1925 and continuously thereafter, the prices to be charged by retailers to whom the licensee-stockholders of Sealy sold their products have been fixed and policed by the licensee-stockholders directly, by Sealy itself, and by collaboration between them. As the District Court found:

> "the stockholder-licensee representatives . . . as the board of directors, the Executive Committee, or other committees of Sealy, Inc. . . . discuss, agree upon and set
>
> "(a) The retail prices at which Sealy products could be sold;
>
> "(b) The retail prices at which Sealy products could be advertised;
>
> "(c) The comparative retail prices at which the stockholder-licensees and the Sealy retailers could advertise Sealy products;
>
> "(d) The minimum retail prices below which Sealy products could not be advertised;
>
> "(e) The minimum retail prices below which Sealy products could not be sold; and
>
> "(f) The means of inducing and enforcing retailers to adhere to these agreed upon and set prices."

These activities, as the District Court held, constitute a violation of the Sherman Act. Their anticompetitive nature and effect are so apparent and so serious that the courts will not pause to assess them in light of the rule of reason. See, *e. g., United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 210–218 (1940); *United States* v. *General Motors,* 384 U. S. 127, 147 (1966).

Appellee has not appealed the order of the District Court enjoining continuation of this price-fixing, but the existence and impact of the practice cannot be ignored in our appraisal of the territorial limitations. In the first place, this flagrant and pervasive price-fixing,

in obvious violation of the law, was, as the trial court found, the activity of the "stockholder representatives" acting through and in collaboration with Sealy mechanisms. This underlines the horizontal nature of the enterprise, and the use of Sealy, not as a separate entity, but as an instrumentality of the individual manufacturers. In the second place, this unlawful resale price-fixing activity refutes appellee's claim that the territorial restraints were mere incidents of a lawful program of trademark licensing. Cf. *Timken Roller Bearing Co.* v. *United States, supra.*[3] The territorial restraints were a part of the unlawful price-fixing and policing. As specific findings of the District Court show, they gave to each licensee an enclave in which it could and did zealously and effectively maintain resale prices, free from the danger of outside incursions. It may be true, as appellee vigorously argues, that territorial exclusivity served many other purposes. But its connection with the unlawful price-fixing is enough to require that it be

[3] In *Timken,* as in the present case, it was argued that the restraints were reasonable steps incident to a valid trademark licensing system. But the Court summarily rejected the argument, as we do here. It pointed out that the restraints went far beyond the protection of the trademark and included nontrademarked items, and it concluded that: "A trademark cannot be legally used as a device for Sherman Act violation." 341 U. S., at 599. Cf. § 33 of the Lanham Act, 60 Stat. 438, as amended, 15 U. S. C. § 1115 (b) (7). In *Timken,* the restraints covered nonbranded merchandise as well as the "Timken" line. In the present case the restraints were in terms of "Sealy products" only. As to their private label products, the licensees were free to sell outside of the given territory and, so far as appears, without resale price collaboration or enforcement. But this difference in fact is not consequential in this case. A restraint such as is here involved of the resale price of a trademarked article, not otherwise permitted by law, cannot be defended as ancillary to a trademark licensing scheme. Cf. also *United States* v. *General Motors,* 384 U. S. 127, 142–143 (1966).

condemned as an unlawful restraint and that appellee be effectively prevented from its continued or further use.

It is urged upon us that we should condone this territorial limitation among manufacturers of Sealy products because of the absence of any showing that it is unreasonable. It is argued, for example, that a number of small grocers might allocate territory among themselves on an exclusive basis as incident to the use of a common name and common advertisements, and that this sort of venture should be welcomed in the interests of competition, and should not be condemned as *per se* unlawful. But condemnation of appellee's territorial arrangements certainly does not require us to go so far as to condemn that quite different situation, whatever might be the result if it were presented to us for decision.[4] For here, the arrangements for territorial limitations are part of "an aggregation of trade restraints" including unlawful price-fixing and policing. *Timken Roller Bearing Co.* v. *United States, supra,* 341 U. S., at 598. Compare *United States* v. *General Motors,* 384 U. S. 127, 147–148 (1966).[5] Within settled doctrine, they are unlawful under § 1 of the Sherman Act without the necessity for an inquiry

[4] Cf. *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 6–7 (1958): "As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself."

[5] Mr. Justice Harlan observed, concurring in the result in *United States* v. *General Motors,* 384 U. S. 127, 148–149, that "Although *Parke Davis* related to alleged price-fixing, I have been unable to discern any tenable reason for differentiating it from a case involving, as here, alleged boycotting." The same conclusion would seem to apply with respect to an alleged market division, which, like price-fixing, group boycotts, and tying arrangements, has been held to be a *per se* violation of the Sherman Act. *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958).

in each particular case as to their business or economic justification, their impact in the marketplace, or their reasonableness.

Accordingly, the judgment of the District Court is reversed and the case remanded for the entry of an appropriate decree.

Mr. Justice Clark and Mr. Justice White took no part in the decision of this case.

Mr. Justice Harlan, dissenting.

I cannot agree that on this record the restrictive territorial arrangements here challenged are properly to be classified as "horizontal," and hence illegal *per se* under established antitrust doctrine. I believe that they should be regarded as "vertical" and thus, as the Court recognizes, subject to different antitrust evaluation.

Sealy, Inc., is the owner of trademarks for Sealy branded bedding. Sealy licenses manufacturers in various parts of the country to produce and sell its products. In addition, Sealy provides technical and managerial services for them, conducts advertising and other promotional programs, and engages in technical research and quality control activities. The Government's theory of this case in the District Court was essentially that the allocation of territories by Sealy to its various licensees was unlawful *per se* because in spite of these other legitimate activities Sealy was actually a "front" created and used by the various manufacturers of Sealy products "to camouflage their own collusive activities . . . ." Plaintiff's Brief in Opposition to Defendants' Briefs, October 12, 1961, pp. 12, 15.

If such a characterization of Sealy had been proved at trial I would agree that the division of territories is illegal *per se*. Horizontal agreements among manufacturers to divide territories have long been held to violate the anti-

trust laws without regard to any asserted justification for them. See *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *United States* v. *National Lead Co.,* 332 U. S. 319; *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593. The reason is that territorial divisions prevent open competition, and where they are effected horizontally by manufacturers or by sellers who in the normal course of things would be competing among themselves, such restraints are immediately suspect. As the Court noted in *White Motor Co.* v. *United States,* 372 U. S. 253, 263, they are "naked restraints of trade with no purpose except stifling of competition." On the other hand, vertical restraints—that is, limitations imposed by a manufacturer on his own dealers, as in *White Motor Co., supra,* or by a licensor on his licensees—may have independent and valid business justifications. The person imposing the restraint cannot necessarily be said to be acting for anticompetitive purposes. Quite to the contrary, he can be expected to be acting to enhance the competitive position of his product *vis-à-vis* other brands.

With respect to vertical restrictions, it has long been recognized that in order to engage in effective *interbrand* competition, some limitations on *intrabrand* competition may be necessary. Restraints of this type "may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business (cf. *Brown Shoe* [v. *United States,* 370 U. S. 294], at 330; *United States* v. *Jerrold Electronics Corp.,* 187 F. Supp. 545, 560–561, aff'd, 365 U. S. 567) and within the 'rule of reason,'" *White Motor Co., supra,* at 263; see also *id.,* at 267–272 (concurring opinion of BRENNAN, J.). For these reasons territorial limitations imposed vertically should be tested by the rule of reason, namely, whether in the context of the particular industry, "the restraint imposed is such as merely regulates and perhaps thereby promotes competition or

whether it is such as may suppress or even destroy competition." *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238. Indeed the Court reaffirms these principles in the opinion which it announces today in *United States* v. *Arnold, Schwinn & Co., post,* p. 365.

The question in this case is whether Sealy is properly to be regarded as an independent licensor which, as a prima facie matter, can be deemed to have imposed these restraints on its licensees for its own business purposes, or as equivalent to a horizontal combination of licensees, that is as simply a vehicle for effectuating horizontal arrangements between its licensees. On the basis of the findings made by the District Court, I am unable to accept the Court's classification of these restraints as horizontally contrived. The District Court made the following findings:

> "84. The preceding [detailed factual] findings indicate the type of evidence in this record that demonstrates that there has never been a central conspiratorial purpose on the part of Sealy and its licensees to divide the United States into territories in which competitors would not compete. Their main purpose has been the proper exploitation of the Sealy name and trademarks by licensing bedding manufacturers to manufacture and sell Sealy products in exchange for royalties to Sealy. The fact remains that each licensee was restricted in the territory in which he could manufacture and sell Sealy products. However, the record shows that this restriction was imposed by Sealy and was also secondary, or ancillary, to the main purpose of Sealy's license contracts.

> .     .     .     .     .

> "119. Plaintiff's evidence, read as a whole, conclusively proves that the Sealy licensing arrangements were developed in the early 1920's for entirely

legitimate business purposes, including royalty income to Sugar Land Industries, which owned the Sealy name, trademarks and patents, and the benefits to licensees of joint purchasing, research, engineering, advertising and merchandising. These objectives were carried out by successor companies, including defendant, whose activities have been directed not toward market division among licensees but toward obtaining additional licensees and more intensive sales coverage."

The Solicitor General in presenting the appeal to this Court stated explicitly that he did *not* contend "that Sealy, Inc. was no more than a facade for a conspiracy to suppress competition," Brief, p. 12, since it admittedly did have genuine and lawful purposes. For me these District Court findings, which the Government accepts for purposes of this appeal, take this case out of the category of horizontal agreements, and thus out of the *per se* category as well.[1] Sealy has wholly legitimate interests and purposes of its own: it is engaged in vigorous interbrand competition with large integrated bedding manufacturers and with retail chains selling their own products.[2] Sealy's goal is to maximize sales of its prod-

---

[1] Compare *United States* v. *General Motors*, 384 U. S. 127, where the undisputed facts as found by the District Court, *id.*, at 140–141, proved a horizontal conspiracy among Chevrolet dealers to initiate and police a boycott of sales by dealers to discount houses. It is precisely because no such horizontal impetus was shown to exist here that I view this case differently. See my opinion concurring in the result in *General Motors*, 384 U. S., at 148.

[2] The District Court made no findings as to the position of Sealy in the bedding industry, but on the basis of testimony introduced and not seriously contravened it appears that Sealy products are by no means the largest selling bedding products, that Sealy manufacturers have many competitors both nationwide and local, and that advertising—particularly nationwide advertising—is an important competitive factor in the industry.

ucts nationwide, and thus to maximize its royalties. The test under such circumstances should be the same as that governing other vertical relationships, namely, whether in the context of the market structure of this industry, these territorial restraints are reasonable business practices, given the true purposes of the antitrust laws. See *White Motor Co., supra; Sandura Co.* v. *FTC*, 339 F. 2d 847. It is true that in this case the shareholders of Sealy are the licensees. Such a relationship no doubt requires special scrutiny.[3] But I cannot agree that this fact by itself *automatically* requires striking down Sealy's policy of territorialization. The correct approach, in my view, is to consider Sealy's corporate structure and decision-making process as one (but only one) relevant factor in determining whether the restraint is an unreasonable one. Compare *United States* v. *Penn-Olin Chem. Co.*, 378 U. S. 158, 170.

The Court in reaching its result relies heavily on the fact that these territorial limitations were part of "an 'aggregation of trade restraints,' " *ante,* p. 354, because the District Court has held that appellee did violate the Sherman Act by engaging in unlawful price fixing. "The territorial restraints," the Court says, "were a part of the unlawful price-fixing and policing," *ante,* p. 356. Noth-

---

[3] The Sealy trademark was originally owned by Sugar Land Industries, and its products were manufactured by a subsidiary, Sealy Mattress Co. In the 1920's independent manufacturers were licensed to produce Sealy products, and in 1925 Sugar Land sold the trademarks to a new corporation, Sealy Corp., owned by one E. E. Edwards and the various Sealy licensees. In 1933, when the economic depression eliminated a number of Sealy producers, the corporation was reorganized into the present Sealy, Inc. At present there are about 30 licensees owning approximately 90% of the stock. This joint-venture approach was created and maintained, the District Court found, "for entirely legitimate business purposes," such as obtaining the benefits "of joint purchasing, research, engineering, advertising and merchandising." Finding 119.

ing, however, in the findings of the District Court supports this conclusion. Indeed, the opposite conclusion is the more tenable one since the District Court that found Sealy guilty of price fixing found at the same time that it had not unlawfully conspired to allocate territories. The Government has not contended here that it is entitled to an injunction against territorial restrictions as a part of its relief in the price-fixing aspect of the case. The price-fixing issue was not appealed to this Court, and we can assume that the Government will obtain adequate and effective injunctive relief from the District Court. For these reasons the Court's "aggregation of trade restraints" theory seems to me ill-conceived.

I find nothing in the Court's opinion that persuades me to abandon the traditional "rule of reason" approach to this type of business practice in the context of the facts found by the trial court. The District Court, however, made no findings in respect to this theory for judging liability since the Government insisted on trying the case in *per se* terms, attempting to prove only a horizontal conspiracy. Although Sealy did introduce some evidence concerning the bedding industry, the territorialization issue was not tried in the terms of the reasonableness of the territorial restrictions. A motion to suppress Sealy's subpoena seeking discovery with respect to one of its leading competitors was successfully supported by the Government,[4] and no evidence directly aimed at

---

[4] See *United States* v. *Serta Associates, Inc.,* 29 F. R. D. 136, where in a companion action against another licensor of bedding products a similar subpoena was quashed after it was opposed by the Government. The District Court there noted: "The complaint alleges price fixing and market allocations by Serta, which it has denied. Defendant alleges the agreements made were reasonable ancillary restraints, valid under the Sherman Act, and the evidence sought by this subpoena would completely corroborate the reasonableness. The plaintiff, the Government, has also filed a brief sup-

justifying territorial limitations as a reasonable method of competition in the bedding industry was taken. Accordingly, the District Court made no findings as to such justification.

Although in the normal course of things I would have voted to remand the case for further proceedings and findings under the correct rules of law, I believe that since the Government deliberately chose to stand on its *per se* approach, and did not prevail, it should not be able to relitigate the case on an alternative theory, especially when it opposed appellee's efforts to present the case that way.

I would affirm the dismissal of this aspect of the case by the District Court.

---

portive of the motion to quash the subpoena. It asserts that the complaint raises per se violations of the Sherman Act which fact renders completely irrelevant the subpoenaed material, tending to confirm the reasonableness of defendant's conduct."