**2361 STATE CORPORATION a/k/a A. Brandwein & Co., Plaintiff-Appellant,**

v.

**SEALY, INC., Carl N. Singer, et al., Defendants-Appellees.**

**No. 16365.**

United States Court of Appeals Seventh Circuit.

Oct. 14, 1968.

---

Richard F. Watt, John M. Bowlus, Robert H. Nichols, Chicago, Ill., for appellant.

Richard W. McLaren, Richard S. Rhodes, David L. Aufderstrasse, Chicago, Ill., Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., of counsel, for defendants-appellees Sealy, Inc., Carl N. Singer, Sealy Mattress Co., Morris A. Kaplan.

Daniel Walker, Mark C. Curran, B. Raoul Yochim, Chicago, Ill., for defendant-appellee Montgomery Ward & Co., Inc.

Before SCHNACKENBERG,* KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action for treble damages arising out of alleged violations of the antitrust laws. The district court granted summary judgment for defendants. Plaintiff appeals.

Plaintiff, 2361 State Corporation, was formerly known as A. Brandwein & Com-

---

* Judge Schnackenberg participated in the consideration and disposition of this case, but died before this opinion was filed.

pany. Until 1964, when it ceased to do business, Brandwein manufactured cotton and innerspring mattresses and box springs in Chicago. For many years, up to 1961, it sold to defendant Montgomery Ward & Company, particularly to Ward's retail and mail order outlets in several midwestern states. Brandwein was one of about 25 firms in the country selling this type of bedding to Ward for resale under Ward's own brand name "Style House."

Defendant Sealy, Incorporated, does not manufacture mattresses or box springs. It licenses about 30 manufacturers to use the Sealy name and trade marks on mattresses and box springs produced according to Sealy specifications. We shall refer to the licensees as the Sealy group.[1] Members of the Sealy group also manufacture and sell mattresses and box springs which do not bear the Sealy name or trade mark. Several of them made sales of private brand merchandise to Ward during the same period as Brandwein.

Defendant Sealy Mattress Company, located in Chicago, is one of the Sealy group.

In 1961, Ward stopped buying these products from Brandwein and other independent manufacturers and thereafter, with few exceptions, bought its "Style House" innerspring mattresses and box springs from members of the Sealy group, through Sealy Incorporated.[2]

The national total wholesale sales of mattresses (apparently including some amount of foam rubber, not involved here) are approximately $425,000,000 per year. Ward purchases about $8,000,000 (excluding foam rubber). The Sealy group's total sales are about $80,000,000. Brandwein's total sales in fiscal 1961, the last full fiscal year it sold to Ward, were $1,749,038, and its sales to Ward $469,417.

Brandwein's amended complaint alleged that during calendar 1961, defendants and the Sealy group "engaged in an unlawful conspiracy and combination to suppress competition in restraint of trade with the purpose of fixing the price at which said licensees should sell cotton and innerspring mattresses and box springs to Montgomery Ward & Co., Inc. and prevent firms other than the licensees of Sealy, Incorporated from selling said mattresses and box springs to defendant Montgomery Ward & Co., Inc." Brandwein alleged a continuing agreement that the Sealy group, acting through Sealy, Incorporated, would fix the price at which the members would sell to Ward, and that Ward would purchase from the Sealy group at that price and would not purchase from others. Brandwein alleged the agreement was carried out from 1961 to 1964.

Brandwein asserted that defendants violated sec. 1 of the Sherman act [3] and sec. 3 of the Clayton act.[4] Violation of sec. 2 of the Sherman act [5] was originally claimed, but need no longer be considered. Brandwein has not challenged the entry of summary judgment against it with respect to sec. 2.

A number of depositions were taken and considered by the district court in deciding to grant summary judgment for defendants. Many facts are not in dispute, although there are areas where

---

1. See description of the Sealy organization in United States v. Sealy (1967), 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238.

2. It should be noted that although certain practices of the Sealy group and Sealy, Incorporated, with respect to licensing production under the Sealy name, have been held unlawful per se, United States v. Sealy, fn. 1, the products involved in the present action do not bear the Sealy name.

3. 15 U.S.C. sec. 1,—combination in restraint of trade.

4. 15 U.S.C. sec. 14,—sale or price fixing on condition that purchaser shall not use goods of seller's competitor, where the effect may be to substantially lessen competition.

5. 15 U.S.C. sec. 2,—monopolizing or attempting to monopolize.

conflicting inferences might be drawn. It does clearly appear that prior to 1961 Ward bought its requirements of inner-spring mattresses and box springs for resale under Ward's brand from some 25 firms, including Brandwein, some members of the Sealy group, and others; in 1961 Ward made an agreement with Sealy, Incorporated and shortly began to purchase all or nearly all its requirements from the Sealy group at a uniform price (or at times with a differential allowed to west coast plants); the members of the Sealy group agreed to permit Sealy, Incorporated to agree with Ward on a uniform price and to allocate the various Ward outlets among members of the Sealy group; as a result of Ward's arrangement with the Sealy group, it ceased to buy from Brandwein and others; Brandwein's sales to Ward had been substantial, 15 to 25% of Brandwein's total.

In seeking summary judgment, defendants contended that the undisputed material facts show that Ward's change of suppliers was a normal business activity, devoid of any illegality; Ward's selection of a new supplier can not constitute a conspiracy under sec. 1 of the Sherman act; Sealy's national accounts program (under which Sealy, Incorporated acted for the Sealy group) does not constitute a restraint of trade; the Sealy-Ward relationship can not constitute an illegal exclusive dealing arrangement; Brandwein was not injured by any alleged act of defendants' and the action is barred by the statute of limitations.

The district court concluded that the action was timely; there is a genuine issue of fact whether Ward had agreed to buy innerspring mattresses and box springs for resale under its private brand exclusively from Sealy; plaintiff Brandwein had failed to produce anything to show that the exclusive dealing agreement, if it existed, resulted in a restraint the effect of which may have been to substantially lessen competition; the record does not suggest that the alleged price fixing was the proximate cause of plaintiff's injury; unless defendants' conduct were shown to have violated sec. 3 of the Clayton act, their conduct would not violate sec. 1 of the Sherman act; and Brandwein had failed to demonstrate a genuine issue of fact as to whether or not it had been damaged.

We shall consider the issues in the following order: (1) statute of limitations, (2) violation of sec. 1 of the Sherman act, (3) violation of sec. 3 of the Clayton act, and (4) damages.

### (1) Statute of limitations.

The complaint was filed March 10, 1965. Some days before March 10, 1961, Ward notified Brandwein that it would obtain its private brand innerspring mattresses and box springs from the Sealy group and would not buy from Brandwein. Brandwein was told, however, that it would take some time to effect the change, and Ward continued to buy from Brandwein until the summer of 1961. 15 U.S.C. sec. 15 provides a cause of action for any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws. 15 U.S.C. sec. 15b bars the action unless "commenced within four years after the cause of action accrued." If Brandwein's cause of action accrued when Ward and the Sealy group reached agreement or when Ward notified Brandwein it would cease buying a few months hence, the action was brought more than four years afterward, and too late. If the cause of action accrued when Ward actually stopped its purchases, the action was brought within four years and was timely.

The district court took the latter view, concluding there was no real injury until Ward ceased buying from Brandwein. We agree.

■ Defendants rely on our decision in Emich Motors Corporation v. General Motors Corp.[6] In that case, plaintiff and defendant had a contract under which de-

6. (7th Cir. 1956), 229 F.2d 714, 59 A.L.R.2d 159.

fendant sold cars to plaintiff. Defendant, allegedly in furtherance of an unlawful conspiracy, gave notice to plaintiff, terminating the contract and plaintiff's contract right to receive cars, although defendant continued to supply cars to plaintiff for several months. This court held that plaintiff's cause of action arose upon the cancellation of the contract and the rights dependent upon it. In the instant case, however, there was no contract between Ward and Brandwein, and the notice was only a statement that in the future Ward would cease buying. The notice itself did not destroy or injure Brandwein's rights. The cause of action, if any, accrued in the summer of 1961 when Brandwein's business was injured by the cessation of Ward's purchases.

### (2) *Violation of sec. 1 of the Sherman act.*

It has recently been decided (after the district court judgment in the instant case) that arrangements among the Sealy group to fix retail prices upon resale of Sealy name products and to allocate mutually exclusive territories among the group are unlawful under sec. 1 of the Sherman act without the necessity for an inquiry in each particular case as to their business or economic justification, their impact in the market place, or their reasonableness.[7]

It is true that the facts are different in some respects. The allocation and price determination in the instant case relate only to one buyer, though a nationwide buyer of substantial volume. The proof indicates that the buyer desires the convenience of dealing with an integrated organization for all its purchases in this line, that there is at least one manufacturer who may be large enough individually to supply Ward's needs, and that the allocation and price fixing, along with quality control by Sealy, Incorporated, may be the only way a group of smaller manufacturers can afford such

convenience to the buyer and secure the business.

Defendants contend that a sales agency agreement, whereby the appointed sales agent acts as such only with respect to a limited number of national buyers who purchase products centrally, does not constitute an illegal price fixing or territory allocation agreement. They cite Appalachian Coals, Inc. v. United States [8] which supports the view that a combination for that purpose may not be illegal per se where the plan is a response to certain types of economic needs. The *Sealy* opinion recognizes a possibility that it might be appropriate to inquire into reasonableness in some situations, the example given being where "a number of small grocers might allocate territory among themselves on an exclusive basis as incident to the use of a common name and common advertisements * * *" The record here does not establish whether, in the light of geographical facts, the amount of competition for Ward business among members of the Sealy group which would be prevented by the allocation and the uniform price would be substantial or miniscule.

But we think that if defendants are in a position to establish, as a matter of law, that the arrangement is reasonable, they have not done so on the motion for summary judgment.

Defendants also contend that Ward had previously reached a decision that it would cease buying its private brand innerspring mattresses and box springs from multiple sources, and that any possible illegality in the Sealy arrangement would be irrelevant to Brandwein's loss of its customer. There is indeed proof that executives of Ward were thinking along the lines of a single or integrated supplier, but we do not view it as conclusively establishing that Brandwein would have lost the business at that time in any event.

7. United States v. Sealy (1967), 388 U.S. 350, at p. 357, 87 S.Ct. 1847, 18 L.Ed. 2d 1238.

8. (1933), 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825.

It should also be noted, as argued by defendants, that the uniform price fixed by Sealy, Incorporated was not so low that Brandwein contends it was unable to meet it. The casual relationship between the agreement of the Sealy group on a uniform price, as well as the agreement to allocate the Ward business, and Brandwein's loss of the business arose, however, if these were inducements which resulted in Ward's decision to buy from the Sealy group, rather than from its former suppliers.

■ We conclude that defendants did not succeed in establishing, on their motion for summary judgment, that the claim of a sec. 1 violation presented no genuine issue as to a material fact.

(3) *Violation of sec. 3 of the Clayton act.*

15 U.S.C. sec. 14 provides, in part, "It shall be unlawful * * * to * * * make a sale * * * of goods * * * for use * * * or resale * * * or fix a price charged therefor, * * * on the condition * * * that the * * * purchaser * * * shall not * * * deal in the goods * * * of a competitor * * * of the * * * seller, where the effect of such * * * sale * * * or such condition * * * may be to substantially lessen competition * * * in any line of commerce."

The district court concluded that on the basis of possible inferences and resolutions of credibility there is a genuine issue of fact whether the sales by the Sealy group were on condition that Ward would not deal in the goods of a competitor of the Sealy group. We agree.

He concluded, correctly, that the record did not show the extent of any anti competitive effect of such condition, nor any basis for selecting the market in which the anti competitive effect is to be measured. He also noted that in order to establish a violation of sec. 3 of the Clayton act, Brandwein must show that the effect of the exclusive dealing agreement may be to substantially lessen competition.[9]

Having so concluded when the court first considered·(and denied) the motion for summary judgment, the court required Brandwein to file a memorandum containing "a statement defining precisely the line of commerce involved, the relevant geographic market, the share of that market foreclosed by the alleged exclusive dealing agreement, and whether the performance of the alleged agreement foreclosed competition in a substantial share of the line of commerce affected." The court authorized defendants to renew their motion for summary judgment after the time within which Brandwein was required to file its memorandum.

Brandwein later informed the court that it had endeavored to discover the data required, but had been unable to do so because data on private brand merchandise were not available.

Defendants renewed the motion for summary judgment. The court took the position that it had imposed on plaintiff Brandwein the burden of coming forward with data because "Plaintiff may not proceed to trial where it has produced only a hope that by trial it may have unearthed something to support its allegations, or when any essential element necessary to its recovery rests upon mere intangible speculation."

■ The district court's decision can not be sustained under the terms of Rule 56 F.R.Civ.P., providing for summary judgment. Under that rule the party opposing summary judgment does not have the burden of showing that there is a *genuine issue for trial until the* movant has produced evidentiary material showing that there is no genuine issue as to any material fact and he is entitled to judgment as a matter of law. Applying the rule to the point under discussion, defendants, movants here, would be *required to have produced evidentiary material which, if unrebutted, would* compel a finding that the exclusive dealing agreement would not substantially

9. Plaintiff has not contended that if it established an exclusive dealing agree-

ment, a rebuttable presumption of an anti competitive effect might arise.

lessen competition before Brandwein would have the burden of producing specific facts showing the existence of a genuine issue for trial.

Perhaps under the circumstances, the action of the district court could be supported as an exercise of inherent power over administration of justice. Where a plaintiff will have to prove a difficult proposition of this type in order to succeed at·trial, it is not unreasonable to require him to demonstrate in advance of trial that he has at least a plan for approaching the issue. If the section 3 Clayton act claim were the only viable one, we would consider further whether the district court's action could be sustained. As already indicated, however, there appear to be genuine issues with respect to the claim under sec. 1 of the Sherman act, and, as will be indicated, with respect to damages. Under the circumstances, we do not foreclose Brandwein from pressing its claim under sec. 3 of the Clayton act in further proceedings.

#### (4) *Damages.*

Brandwein's operations had been unprofitable for a number of years. It ceased doing business in 1964. Its smallest net loss in its last ten fiscal years (ending April 30) was $494 in the fiscal year ending in 1960. Net losses in other years of the last ten ranged from $31,279 in the fiscal year ending in 1957 to $291,846 in the fiscal year ending in 1954. Sales to Ward were a very substantial portion of Brandwein's business, but it appears to have lost other business at or before the time it lost Ward's.

Sales to Ward terminated early in the fiscal year ending April 30, 1962. Sales and profits for the last five full fiscal years were as follows:

| Fiscal year ended 4/30 | Total Sales | Ward Sales | Other Sales | Gross Profit · | Net Profit (Loss) |
|---|---|---|---|---|---|
| 1959 | $2,084,550 | $305,859 | $1,778,691 | $357,642 | ($56,754) |
| 1960 | 3,347,032 | 509,052 | 1,837,980 | 406,046 | ( 494) |
| 1961 | 1,749,038 | 469,417 | 1,279,621 | 259,119 | ( 85,021) |
| 1962 | 1,446,818 | 149,758 | 1,297,060 | 254,296 | ( 48,647) |
| 1963 | 1,499,744 | —0— | 1,499,744 | 249,221 | ( 65,374) |

An officer of Brandwein testified on deposition that sales to Ward were profitable, and he submitted an affidavit in opposition to the motion for summary judgment showing that prices to Ward included cost of material, cost of direct labor, and allowances for manufacturing overhead and general and administrative overhead, including a profit.

Defendants seem to contend that comparisons of the net loss figures for periods after the loss of the Ward business with periods before such loss compel the inference that Brandwein was not damaged by the loss. We do not agree. If, as the record also indicates, prices paid by Ward were sufficient to defray all direct costs and, in addition, to return a portion of the expenses and charges which would have been incurred whether sales were made to Ward or not, it is probable that if Ward had continued to buy, Brandwein's net losses would have been smaller. The variations in net loss figures relied on by defendants simply do not compel a finding that Brandwein was not injured by the loss of the Ward sales.

■ Defendants have not succeeded in showing that there is no genuine issue as to damages.

Here again the district court placed the burden on plaintiff Brandwein. In the same order imposing the requirement discussed in (3) above, the court required Brandwein to file a memorandum which "demonstrates that plaintiff is seeking to recover a loss of net profits."

Brandwein made no response to this requirement and it is not entirely clear what the court intended it to do.

In ultimately granting summary judgment, the district court indicated the view that it was speculative and conjectural whether Brandwein would have had smaller net losses if it had retained the Ward business. Concededly, Brandwein could have more fully demonstrated the relationship between the Ward business, or lack of it, and the net results of its operations, but we think a genuine issue for trial sufficiently appeared.

The judgment is reversed and the cause remanded for further proceedings.