Robert J. SWETTLEN and Patricia A.
Swettlen, his wife

v.

WAGONER GAS AND OIL, INC., a Pennsylvania corporation, et al.

Civ. A. No. 72–111.

United States District Court,
W. D. Pennsylvania.

Jan. 10, 1974.

Daniel J. Beggy, Pittsburgh, Thomas J. Godlewski, Greensburg, for plaintiffs.

Dale Hershey, Edmund K. Trent, Pittsburgh, for defendants.

## OPINION AND ORDER

SNYDER, District Judge.

The Defendant, Phillips Petroleum Company (hereinafter called "Phillips"), moved the Court for a Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure, in this Anti-trust suit. This Motion must be denied.

██ Summary Judgment as envisioned by Rule 56 is a method of testing in advance of trial, not just the bare contentions found in the legal verbiage of the pleadings, but whether there is in actuality any real basis for relief or defense. The discussion in Moore's Federal Practice (Vol. 6 ¶ 56.15 [3] (2nd Ed. 1972) is particularly applicable here:

> "The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to judgment as a matter of law.
>
> The courts hold the movant to a strict standard. To satisfy his burden a movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact."

██ As recently indicated by our Circuit Court of Appeals in Hubicki v. A.C.F. Industries, Incorporated, 484 F.2d 519 (3rd Cir. 1973), the purpose of summary judgment is to expeditiously determine cases without necessity of formal trial where there is no substantial issue of fact. If such factual dispute exists, summary judgment is not the proper remedy. We must determine whether, based upon the pleadings and all other matters of the parties on file, there is any genuine issue of material fact which involves the liability of Phillips.

The Complaint in this case was instituted under Sections 3 and 4 of the Clayton Act (15 U.S.C. §§ 14 and 15), and Section 1 of the Sherman Act (15 U.S.C. § 1)[1] against Wagoner Gas and

---

1. Section 1 of the Sherman Act reads as follows:

    "*Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty.*

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided*, That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law,

Oil, Inc. (hereinafter called "Wagoner, Inc."), Phillips Petroleum Company, and George H. Wagoner, as an individual. The Complaint sets forth in detail the Anti-trust scheme. The Plaintiffs were retail dealers in gasoline and other automotive products and on September 1, 1969, leased a premises from Wagoner Gas and Oil, Inc. for the operation of an automotive service station located in the Borough of Youngwood, Westmoreland County, Pennsylvania. The real estate was owned by the Defendant, George H. Wagoner. The Defendant, Phillips, had previously entered into an agreement whereby Phillips was the exclusive supplier of gasoline and other products to Wagoner, Inc. Plaintiffs further allege that Wagoner, Inc. with the "knowledge, consent and aid" of Defendant Phillips for the common purpose and design to fix and control prices, compelled the Plaintiffs who were the retail dealers to purchase tires, batteries, greases, oils, accessories and other items which Wagoner, Inc. sold; in addition, George Wagoner and Wagoner, Inc., with the knowledge, consent and aid of Phillips, and with the common purpose and design to fix and control prices, established the retail price at which the Plaintiffs could sell gasoline, all of which price fixing was alleged to be in restraint of trade.

On February 3, 1972, Plaintiffs applied for a Preliminary Injunction under the provisions of Section 16 of the Clayton Act, 15 U.S.C. § 26, to gain possession of the keys to the pumps. The Plaintiffs allege that Wagoner, Inc. and George Wagoner, as an individual, combined and conspired to fix the prices on the Plaintiff's sale along with Defendant Phillips, and that Wagoner retained the keys to the pumps by which the prices were posted, effectively carrying out the

or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. July 2, 1890, c. 647, § 1, 26 Stat. 209; Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693; July 7, 1955, c. 281, 69 Stat. 282."

Section 14 of the Clayton Act reads as follows:
"*Sale, etc., on agreement not to use goods of competitor*
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. Oct. 15, 1914, c. 323, § 3, 38 Stat. 731."

Section 15 of the Clayton Act reads as follows:
"*Suits by persons injured; amount of recovery*
Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
Oct. 15, 1914, c. 323, § 4, 38 Stat. 731."

conspiracy and combination to fix the prices. The injunction request was subsequently withdrawn when the Plaintiffs cancelled the lease effective April 30, 1972.

On February 29, 1972, Wagoner, Inc. filed an Answer which in effect set forth that the Complaint failed to state a claim upon which relief could be granted as to it, and denied each and every other allegation of the Complaint. Also on February 29, 1972, Phillips filed an Answer setting forth that the Complaint failed to state a claim upon which relief could be granted as to it, that none of the alleged activities of Phillips constituted a restraint of trade or commerce among the several States, and denied that the statutes under which the Complaint was brought made illegal any of the conduct alleged against Phillips. Numerous Requests for Answers to Interrogatories, Motions for Sanctions and for Protective Orders were made by all of the parties.[2] This Court on June 26, 1972, after conference with counsel and by agreement, ordered the Plaintiffs to answer certain interrogatories, permitted the Plaintiffs to inspect documents as more particularly outlined in the Order, and directed the Plaintiffs to file with the Court by August 31, 1972, a definitive statement of their theory on damages together with supporting data.

The Plaintiffs subsequently filed a Pretrial Statement as to damages, which for ease of reference is attached to this Opinion as Exhibit A. [Omitted from published opinion.] This Statement sets forth that the Plaintiffs sold two grades of gasoline, Regular and Premium. However, the price depended on which pump dispensed the gasoline and what Wagoner, Inc. called it. For instance, when the Plaintiffs first started Wagoner, Inc. had regular gasoline and truck gasoline, which was two cents less. Later, Wagoner, Inc. installed "Blend" pumps which blended regular and premium gasolines. It was apparently impos-sible to determine how much of each gasoline went into the final blend mixture. Wagoner also sold Flite Fuel and Commercial Premium which were exactly the same, but sold for three or four cents difference in price per gallon. For the most part Wagoner, Inc. charged the Plaintiffs 38.9 cents per gallon of gasoline which was sold by the Plaintiffs for as low as 34.9 cents per gallon. Wagoner, Inc. would make a rebate to the Plaintiffs but in any event the price which the Plaintiffs charged was based on the price set on the pumps. This pricing was controlled completely by Wagoner, Inc.

On November 22, 1972, the provisions of Local Rule 5(II), which govern Pretrials, were invoked and this case was set for pretrial upon completion of the time limitations set forth in the Rule. A copy of Rule 5(II) is attached to this Opinion as Exhibit B. [Omitted from published opinion.] It was not until March 1, 1973, however, that Defendant George Wagoner filed an Answer, which was substantially similar to the Answer previously filed by Wagoner, Inc.

This Court again responded to a Request of the Plaintiffs for the Production of Certain Documents on March 20, 1973 by directing that the Plaintiffs arrange for any additional depositions within thirty days from the date the documents were made available to them and that all discovery was to be completed by June 30, 1973. In response to the Plaintiff's Motion for Extension of Time to Complete Discovery, it was agreed by all counsel on June 6, 1973, that the Plaintiffs' full Pretrial Statement would be filed by August 10, 1973; that Defendants' Pretrial Statements would be filed by August 25, 1973; and that the Pretrial Conference would be scheduled shortly thereafter. At a subsequent Status Conference a further extension was granted to the Plaintiffs giving them until August 24th while the Defendants thereby were given until

2. These requests and motions were ruled on by Judge Joseph Weis, Jr., who entered the Order of June 26, 1972.

September 1, 1973 to file their Statement. The Plaintiffs did file their Pretrial Statement on August 24, 1973, and Defendant Wagoner, Inc. filed a Request for Admissions by the Plaintiff on that same date. The Plaintiffs objected to the Request for Admissions claiming that the installation of the "Blend" pumps was done by Wagoner, Inc. and that Phillips consented to the installation. The Plaintiffs neither admitted nor denied that the installation was done without the control or direction of Phillips, "it being beyond the knowledge of the Plaintiffs." The Plaintiffs further allege that the prices they were charged for the gasoline were based on a sliding scale that Wagoner, Inc. controlled. The retail price set on the pumps was the price paid by the Plaintiffs and this retail price was controlled by Wagoner, Inc., and if the retail price was raised. then Wagoner's price to the Plaintiffs automatically went up.

Phillips then filed a Motion for Summary Judgment claiming that under all of the Depositions and Answers to Interrogatories the Plaintiffs had made out an Anti-trust action against Wagoner, Inc. relative to the pricing methods employed by Wagoner, Inc. in its sales of gasoline and diesel fuel to the Plaintiffs. Phillips claimed that they had no contact with the Plaintiffs and that while Phillips did sell products to Wagoner, Inc., they did not sell to the Plaintiffs. Phillips set forth that the Plaintiffs testified repeatedly in depositions that they knew of no act of Phillips which resulted in injury to them and that in their Pretrial Statement the Plaintiffs had outlined the injuries which they had suffered and the method of calculating their damages, but that none of these were caused by Phillips. In addition, Phillips asserted that Plaintiffs' Pretrial Statement alleged that Phillips knew such practices were illegal, benefited from the practices, and continued to renew jobber contracts with Wagoner, Inc. in spite of its alleged knowledge of the illegalities in order to acquire the alleged benefits. Thus, the Swettlens allege Phillips to be a conspirator with Wagoner, Inc.

Defendant Phillips then state their contention that there was no evidence whatsoever that they knew of or understood the details of Wagoner's pricing methods, nor that they had any control over it. They allege, to the contrary, that Phillips knew only of the results of the pricing method, i. e., the price charged by Wagoner, Inc. to the Plaintiffs and the price charged by the Plaintiffs to the public. They allege that Phillips had no knowledge or understanding of how the system operated to establish such prices and, therefore, had no knowledge of its alleged illegality. It was claimed that the full extent of Phillips' knowledge and understanding of the Wagoner pricing system was that set forth in an internal memorandum from L. A. Jensen to D. H. Forehand and the attachments thereto, under date of October 29, 1971. This memorandum and attachments were included as part of the Motion for Summary Judgment. Wherefore, the Plaintiffs having denied that Phillips caused them any injury, and there being no facts alleged which could be presented to the jury in support of the Plaintiffs' allegations concerning liability on the part of Phillips, the Court is requested to grant the Motion for Summary Judgment.

There was also included in the Motion for Summary Judgment the Affidavit of William C. Gilleispie, Marketing Representative of Phillips. In his affidavit Mr. Gilleispie stated that during the periods in question Phillips' products were sold to a jobber in Westmoreland County, Wagoner, Inc., which in turn sold these products to various service station dealers, including the Plaintiffs. He further stated that neither he nor Phillips were involved in the pricing arrangement except insofar as was set forth in the memorandum attached to the Motion for Summary Judgment. This memorandum indicated that Phillips did not know the terms of the lease or the equipment agreement made between the Plaintiffs and Wagoner, Inc.,

did not know the amount of rent paid by the Plaintiffs to Wagoner, Inc., did not know of the cost of utilities paid by the Plaintiffs, did not know the nature of the accounts as between the Plaintiffs and Wagoner, Inc., did not know Wagoner's method of billing Plaintiffs for gasoline or diesel fuel, did not even know, prior to the commencement of this action, that Wagoner, Inc. kept the keys to the Plaintiffs' pumps. In addition, Mr. Gilleispie stated that the method used by Wagoner, Inc. to price gasoline and diesel fuel was unique and was not used by any other jobber, and was fully understood only by Wagoner's personnel. It was also alleged that he, Gilleispie, never indicated to Wagoner, Inc., to the Plaintiffs or to anyone else, on behalf of Phillips, any approval or disapproval of the Wagoner pricing method. He did not understand it fully enough to comment upon it and further, he did not consider the method to be a matter for concern on the part of Phillips.

■ It is specifically noted that under the mandate of Rule 56(c), Summary Judgment is to be rendered forthwith if the pleadings, depositions, and answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Under sub-paragraph (e), when a Motion for Summary Judgment is made and supported as provided in the Rules, the adverse party may not rest on the mere allegations of the pleadings, but the response by affidavit or otherwise as provided in the Rule must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, Summary Judgment, if appropriate, shall be entered against him. Hubicki v. A.C.F. Industries, Inc., 484 F.2d 519 (3rd Cir. 1973).

■ In reply to the Motion for Summary Judgment, the Plaintiffs filed their Answer and attached thereto seven documents on which the Plaintiffs rely to establish the existence of the material issue. We agree with the Plaintiffs that a persual of all of these documents does set forth a basis of liability against Phillips. It is apparent that in 1965, Wagoner, Inc. became interested in joining with a competitor of Phillips, namely the Sun Oil Company. (Exhibits F and G). George H. Wagoner and Wagoner, Inc. developed a marketing system which was based on a sliding scale which would establish both jobber's and the dealer's (such as the Swettlens) profit margins, depending on retail prices. (Stipulation No. 25.) Phillips, apparently in order to keep Wagoner, Inc. as a jobber, negotiated these profit margins as outlined in Exhibit G of the Plaintiffs' Answer to the Motion for Summary Judgment, which states:

"We (Phillips) have discussed with the Jobber various other sliding scale margins, particularly at the high and low ranges, but this seems to most equitably resolve the question of *Dealer* and Jobber Margins." (Emphasis added)

Thus, the scheme to control dealer margins at the various price levels was apparently negotiated by Phillips and Wagoner, Inc. In addition, Phillips was aware that exactly the same gasoline was sold out the Blend Pumps and the Standard Pumps at a two cent differential. It was apparent then to Phillips that the Plaintiffs' margin of profit on the same gasoline (received in the pumps from the same delivery truck) was different depending on which pump was used to dispense the gasoline, and this scheme was agreed upon between Phillips and Wagoner, Inc. It is obvious then that the Plaintiffs have evidence to indicate that Phillips is a conspirator along with George Wagoner and Wagoner, Inc. in a price fixing agreement. It is the contention of Phillips that even assuming Wagoner, Inc.'s pricing method was employed in some illegal manner and that Phillips did nothing to stop Wagoner, Inc. from making use of the pricing method, as a matter of law such

knowledge and failure to act would not create any legal duty or liability on the part of Phillips. While the legal principle is undoubtedly true that if Phillips was not a participant they could have no liability, it does not answer the Plaintiffs' contention as set forth in the various documents that Phillips negotiated the entire method of procedure with Wagoner, Inc. and would certainly thus become actors in the overall scheme, if such scheme can be considered to be illegal. We must then turn our attention to whether Phillips' actions constituted a "contract combination . . . or conspiracy, in restraint of trade." The applicable legal framework has been well defined.

■■ In the first place, any vertical agreement, express or implied, having the effect of stabilizing prices in the retail market is a substantial threat to the policies of free competition which were the basis for the Sherman Act. Thus, an illegal combination to fix prices results whenever a seller suggests retail price and secures compliance by means in addition to the "mere announcement of his policy, and refuses to deal" if the policy is not complied with. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 512, 4 L.Ed.2d 505, 515 (1960). The courts have not hesitated to pierce the complexities of real price maintenance schemes in which coercion is used on retail outlets to achieve resale price maintenance and "it matters not what the coercive device is." Simpson v. Union Oil Company of California, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98. Thus, the Plaintiffs' proffered evidence in this case (including all documents) provides a basis for finding that Phillips' conduct toward the Plaintiffs constituted a coercive effort to secure compliance with Phillips' pricing system as agreed upon with George Wagoner and Wagoner, Inc. Retail price schemes are "unlawful under (Section 1 of the) Sherman Act without any necessity for inquiry in each particular case as to their business or economic justification, their impact in the market-

place or their reasonableness." United States v. Sealy, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).

Phillips here, as Gulf did in Lehrman v. Gulf Oil Corporation, 464 F.2d 26 (5th Cir. 1972) takes the position that we deal with "a facially benign business practice, not uniform throughout the area of its use." We conceive, however, that Phillips can have no more success than did Gulf in the Lehrman case where the Court held that the Anti-trust Statutes could be violated considering the application of the pricing system and the harm to the nation's commerce that could be threatened by allowing (Gulf's) behavior to go uncorrected. We think the means here employed went well beyond a mere announcement of a policy or a simple refusal to deal if the suggested prices were not adhered to so that an issue of fact exists as to whether or not there existed an illegal contract, combination or conspiracy (of course, assuming that the Plaintiffs can sustain all of their allegations).

■ We agree with the Plaintiffs' contention that the philosophy of the Sherman Act is that once a seller sells goods and title passes, the buyer must be free to set whatever price he wishes. The buyer must be free to either raise or lower or leave the price the same.

One of the crucial exhibits offered by the Plaintiffs in their Answer to the Motion for Summary Judgment, and its authenticity is not disputed by the Defendant Phillips, is Exhibit G (the Phillips' inter-office memorandum from their Columbus Office to the Main Office in Bartlesville, Oklahoma, which, in substance, outlined the relationship between Wagoner, Inc. and Phillips, particularly in relation to the interest expressed by Wagoner in Sun Oil Company's form of marketing). The crux of the matter was that while Wagoner made a proposal for the use of blending pumps there was also a detailed part of the agreement indicating the grade, the price, the total margin, the dealer margin and the jobber margin that would

apply to the sales of gasoline. In that inter-office memorandum was contained the following:

"We will have to consider, of course, that if this program meets with management's approval and is offered to Wagoner Gas and Oil that we would be placed in the position of offering the same program to our other six jobbers in Western Pennsylvania, or at least, we would find it necessary to condone this practice if the other six jobbers chose to market in this manner, that is, with the blending pump. None have expressed a desire to utilize a blending pump as of this writing. Most could not afford the installation. Therefore, we have two marketing programs in effect in Western Pennsylvania. For reasons of discrimination, we do not believe we could refuse assistance."

In addition, there was contained the following:

"We have discussed with the jobber various other sliding scale margins particularly at the high and low ranges, but this seems to most equitably resolve the question of dealer and jobber margins."

In the opinion of the Court, this tends to show a participation by Phillips, in the absence of explanation as to the extent of control or non-control and the effect on commerce, all of which prevent the granting of the Motion for Summary Judgment. We believe to be most apropos the following which was set forth by the Supreme Court of the United States in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1939) 310 U.S. at page 218, 60 S.Ct. at p. 842, at page 1165:

"Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 ALR 989, and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act."

310 U.S. page 221, 60 S.Ct. page 843, page 1167: "The reasonableness of prices has no constancy due to the dynamic quality of business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjudgment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system. But the thrust of the rule is deeper and reaches more than monopoly power. Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has. the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any

special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike. There was accordingly no error in the refusal to charge that in order to convict the jury must find that the resultant prices were raised and maintained at "high, arbitrary and noncompetitive levels." The charge in the indictment to that effect was surplusage.

Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible. Price-fixing as used in the Trenton Potteries Co. Case has no such limited meaning. An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used. That price-fixing includes more than the mere establishment of uniform prices is clearly evident from the Trenton Potteries Co. Case itself, where this Court noted with approval Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, in which a decree was affirmed which restrained a combination from "raising or lowering prices or fixing uniform prices" at which meats will be sold. Hence, prices are fixed within the meaning of the Trenton Potteries Co. Case if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon. And the fact that, as here they are fixed at the fair going market price is immaterial. For purchases at or under the market are one species of price-fixing.

\* \* . \* \* \* \*

Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."

Since the alleged violations made by Plaintiff if proven would also violate the Clayton Act, there would be no reason to grant Summary Judgment in regard to any alleged Clayton Act violations. If there is a violation of the Sherman Act where 15 U.S.C. § 1 and 15 U.S.C. § 14 violations are alleged, usually the more specific violation in 15 U.S.C. § 14 can also be proven. See Luria Brothers & Company v. F.T.C., 3 Cir., 389 F.2d 847, cert. denied 393 U.S. 829, 89 S.Ct. 94, 21 L.Ed.2d 100; Mercantile National Bank of Chicago v. Quest, Inc., 303 F.Supp. 926 (N.D.Ind.1969); Fagan v. Sunbeam Lighting Co., Inc., Eastern, 303 F.Supp. 356 (S.D.Ill.1969).

From all of the facts as set forth in the Stipulation and the Answer to the Motion for Summary Judgment, we believe that there are clear issues of fact which must be submitted to a jury as to the Defendant Phillips. The Motion for Summary Judgment must, therefore, be denied.

An appropriate order will be entered.