AFFILIATED CAPITAL CORPORA-
TION, Etc., Plaintiff-Appellant,

v.

CITY OF HOUSTON, et al., Defendants,

Gulf Coast Cable Television and James
J. McConn, Defendants-Appellees.

No. 81–2335.

United States Court of Appeals,
Fifth Circuit.

March 17, 1983.

Stephen D. Susman, William H. White, Charles J. Brink, Houston, Tex., Michael M. Barron, Austin, Tex., for plaintiff-appellant.

Rufus Wallingford, Houston, Tex., for James J. McConn.

John L. Jeffers, Richard B. Miller, Houston, Tex., for Gulf Coast Cable.

Before CLARK, Chief Judge, GEE and GARZA, Circuit Judges.

GARZA, Circuit Judge:

The district court's grant of judgment *non obstante veredicto* caused the plaintiff to initiate this appeal. After a thorough consideration of the record, we find the territorial market division involved in this case to be a *per se* violation of the Sherman Act, 15 U.S.C. § 1. We, therefore, reverse the lower court judgment and reinstate the jury's award of $2,100,000 damages.

## FACTS

The events which culminated in this litigation were played out in Houston, Texas, where in 1978, cable television franchises were awarded. This was not the first time that cable television for the city of Houston had been discussed. Six years earlier, the city had sought applicants for cable television franchises. In 1972, several firms submitted applications and, following the review of these applications by the Public Service and Legal Departments, two were recommended to the Mayor and City Council. The vote of Mayor and City Council determined that a franchise for the entire city be awarded to one corporation.

The unsuccessful franchise applicant, Gulf Coast Cable Television Co. [hereinafter

Gulf Coast], thereafter secured a petition of more than five hundred Houston voters calling for a referendum on the Council action.[1] When put to a vote of the populace of the city, the "monopoly" franchise was soundly defeated.

The Mayor of Houston in 1978 had been a city councilman in 1973, and accordingly, was anxious to avoid a repeat of the problems encountered. The Mayor testified at the trial below that he, therefore, determined that a number of franchises would be granted instead of the monopoly approved in 1973. Additionally, he resolved that, where qualified, local applicants would be favored. Finally, he concluded that minority participation should be permitted. Unfortunately, the Mayor did not stop there at his manipulation of the cable television franchising process.

Defendant Gulf Coast was the first of many concerns to seek a cable television franchise in 1978.[2] There is ample evidence that the city of Houston did not even initiate the franchise process; defendant Gulf Coast approached the city and made application for a franchise. This action served as the commencement of a very unusual process. The city of Houston must be characterized as a highly desirable market for cable television. The city, however, made no effort to take advantage of this fact by broadcasting, via trade publication or otherwise, its intention to award franchises. Instead of following this common practice, the city simply passively accepted applications as they arrived. From the many applications which were submitted to the Public Service Department, four emerged as strong contenders based not on the strength of their proposals, but rather the political strength of the men behind them. These four actors were Gulf Coast, Houston Cable Television Co., Houston Community Cable Television Co., and Meca. Mayor McConn had let it be known that he did not want to

choose between competing applicants. He wanted the applicants to work together, resolve any overlaps in their territories and present him with a finished product. He abdicated his responsibility in the franchising process to a group of powerful Houston businessmen. In turn, these businessmen became "friendly competitors" in an effort to segment the city among themselves and prevent any outsiders from competing with them.

These businessmen and their attorneys met, and over a period of time arrived at mutually agreeable franchise areas. The Mayor reentered upon the scene at this juncture, however, and informed Gulf Coast that another applicant must be added to the ranks. Westland Corporation, a group controlled in large part by the Mayor's personal attorney, must be given a franchise. The area involved was a portion of the territory sought by Gulf Coast. Conscious of both the political realities of the situation and the need to avoid competition among potential franchises, Gulf Coast decided to redraw the franchise boundaries in order to comply with McConn's wishes. Now the businessmen were prepared to present a *fait accompli* to the Mayor and City Council.

While Gulf Coast and the above-mentioned applicants were cutting out competition by cutting up the city among themselves, the plaintiff, Affiliated Capital Corporation [hereinafter Affiliated] entered the picture. Affiliated is a publicly-held corporation that owned a savings and loan association. A federal prohibition against owning both savings and loan associations and cable television systems prevented Affiliated from making application for a franchise until it sold the savings and loan association. After the mid-September sale, Affiliated hired a local attorney to check into the status of the franchising process. When the attorney contacted counsel for

---

1. Tex.Rev.Civ.Stat.Ann. art. 1181 (Vernon 1963) and the Charter of the city of Houston provided for this procedure.

2. Gulf Coast is a limited partnership which operates solely in the cable television business.

After its unsuccessful bid for a franchise in the city of Houston in 1972, Gulf Coast remained in business and obtained franchises for a number of the small cities that lie within the Houston metropolitan area.

Gulf Coast, he was informed that Affiliated was too late because the "pie had been cut." Amazed by this news, Affiliated's president, Billy Goldberg, went to visit the Mayor, who assured him that there was still time for Affiliated to receive a fair hearing. Consequently, Affiliated made application for a cable television franchise on October 16th.

Although the city never advertised its intention to award cable television franchises, it did take several other measures during this period calculated to give the appearance that the citizens of Houston would receive quality cable television service. The Public Service Department prepared a questionnaire which was distributed to all franchise applicants. The city hired a consultant, Dr. Robert Sadowski, to evaluate the applicants based on their responses to this questionnaire. By the middle of November, Dr. Sadowski had completed a report which was highly critical of the manner in which the franchising process was being handled. He declared that it was not rational to allow the applicants themselves to divide the city into franchise territories. He concluded that this was not a procedure designed to give the citizens of Houston the best possible cable television service.

In addition to this general indictment of the process, Dr. Sadowski recommended that only two of the applicants, Meca and Cable-Com, be awarded the franchise areas they sought.[3] He urged that three applicants, Houston Cable, Westland, and Houston Community Cable, be rejected and that the size of defendant Gulf Coast's service area be substantially reduced. He apparently had doubts about the ability of Gulf Coast to service even this smaller territory so he made a personal visit to its facility. Shortly after this visit, Sadowski was fired. His conclusions were altered before the re-

port was made public. The five ultimately successful applicants were pronounced qualified.[4]

The City Council was now prepared to take final action on the cable television franchise applications. The president of Affiliated appeared before City Council and requested that his application be given due consideration. Instead of due consideration, Council, through Councilman Johnny Goyen, offered the advice that Affiliated should go and work out an agreement with defendant and the other above-mentioned applicants.

Mr. Goldberg, let me address Council's wisdom. As these applications came in, they were sent to the Legal Department. Obviously, a number of lawyers got together and did whatever they did. I was not privy to it nor did I want to sit in on any meeting.

Apparently, they came up with the formula that those applicants agreed upon. I was hoping that your situation might end up in the same pot as the others, whereby there would be some kind of recommendation coming before this Council, and this Council would not have to carve from one to give to another, which we have not had to do in the past and which I do not want to do now nor do I intend to.

I do not want to taketh away and giveth to somebody else, because I haven't had to do that in the past. You have a very competent attorney, and the other people have very competent attorneys. What I would like to see done, and it might take a motion to get this done, is to send this to the Legal Department and try to work something out.

Plaintiff's Exhibit 150 at 27–28.

The message to Goldberg was clear: it was not the Council, but rather private

3. Doctor Sadowski never evaluated the application submitted by Affiliated for this report. It was submitted after the termination of his employment.

4. Shortly before the franchise ordinances were considered by City Council, the Public Service Director submitted a letter to the City Attorney to the effect that he lacked the information necessary to judge the merits of each application. In relevant part, the letter concluded that "[w]hile these issues may have been considered by the drafting principals, and may have been addressed satisfactorily by them, I have no way of knowing this." Record on Appeal, vol. 14, at 616. The "drafting principals" were later identified as the attorneys for certain franchise applicants.

businessmen who would decide the future of cable television in Houston. When Mr. Goldberg did not make an agreement with those businessmen, the City Council and Mayor voted for the convenient franchise package with which they were presented by Gulf Coast. This action led Affiliated to the federal courthouse with the allegation that defendants had engaged in a conspiracy to prohibit its entry into the Houston cable television market, thereby violating section 1 of the Sherman Act. Specifically, the plaintiff claimed that certain applicants for cable television franchises agreed to define the territories in which they would apply for franchises, so that no two members of the conspiracy would compete for the same territory. In addition, plaintiff charged defendants with participation in a more general conspiracy to limit competition for cable television franchises by excluding non-conspirator competitors.

## DISTRICT COURT JUDGMENT

At the close of evidence in the trial of the instant case, the jury was presented with a series of interrogatories. The relevant interrogatories, as well as the jury responses thereto, are reproduced below.

### INTERROGATORY NO. 1

It is established that two or more franchise applicants, including defendant Gulf Coast, participated in agreements on boundary lines so as to divide the geographic areas for which these applicants would seek cable television franchises. Do you find from a preponderance of the credible evidence that these arrangements were part of a conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act. Answer "yes" or "no."

ANSWER: No.

### INTERROGATORY NO. 3

Do you find from a preponderance of the credible evidence that one or more of the defendants participated in a conspiracy in unreasonable restraint of trade to limit competition for cable television franchises, in violation of Section 1 of the Sherman Act? Answer "yes" or "no."

ANSWER: Yes.

\* \* \* \* \* \*

### INTERROGATORY NO. 4

Do you find from a preponderance of the credible evidence that any of the following persons participated in that conspiracy? Answer "yes" or "no."

a. City of Houston

Yes

b. Mayor Jim McConn

Yes

c. Gulf Coast Cable Television

Yes

### INTERROGATORY NO. 5

Do you find from a preponderance of the credible evidence that either of the conspiracies, if you have so found in answer to Interrogatories 1 or 3, proximately caused injury to the plaintiff's business or property? Answer "yes" or "no."

ANSWER: Yes.

\* \* \* \* \* \*

### INTERROGATORY NO. 6

What sum of money, if paid now in cash, do you find from a preponderance of the credible evidence would fairly and reasonably compensate plaintiff for the damages, if any, you find plaintiff has incurred? Answer in dollars and cents, if any.

ANSWER: $2,100,000.00.

The jury's verdict was not destined to be entered into judgment. In a post-trial motion, defendant Gulf Coast argued for judgment notwithstanding the verdict on three grounds. Defendant asserted that all of plaintiff's evidence had related to boundary agreements so that there was no evidence to support the jury's finding of an independent conspiracy under interrogatory three. Likewise, defendant claimed that there was no evidence exclusive of boundary agreements to support the finding of causation

on the fifth interrogatory.[5] In a thorough and carefully researched opinion, *Affiliated Capital Corp. v. City of Houston,* 519 F.Supp. 991 (S.D.Tex.1981), the district court granted the requested relief. Although the judge found evidence independent of the boundary agreements to support the answer to interrogatory three,[6] he con-

5. Defendant also argued that the *Noerr-Pennington* doctrine mandated judgment notwithstanding the verdict. This contention is discussed in a later portion of this opinion.

6. In response to defendant's motion, plaintiff cited a wealth of evidence to demonstrate a second theory of conspiracy. In its memorandum opinion the court set out all the evidence which it agreed would support a second theory of conspiracy to limit competition:

By late August 1978, Clive Runnells, on behalf of Gulf Coast, had agreed with Meca that they would be friendly competitors. Testimony of Clive Runnells. Al Levin, Affiliated Capital's lawyer during the franchising process, testified that by September 20, 1978, he contacted Bill Chamberlain, an agent of Gulf Coast. Chamberlain told him that Gulf Coast's attorney Bill Olson "was a pushing force of the cable TV situation at that point." Levin further testified that he then contacted Olson and Olson told him, "as far as I am concerned, Al, it's too late; the pie has already been cut." Olson added: "Al, tell Billy [Goldberg] he is too late on this one." "[Olson's] words were, 'the City is locked up by five franchises.'" On the day before this telephone conversation between Levin and Olson, Olson had told Jonathan Day, an attorney for Houston Cable, that Olson was "trying to put map together" and that "most of areas are defined on eastern side." Plaintiff's Exhibit 63.

On September 28, 1978 a lawyer for Houston Cable wrote to the lawyer for Gulf Coast regarding the franchise ordinance:

Enclosed is a copy of the proposed cable television ordinance marked to show deletions and additions, including some recommended by our FCC counsel. Also enclosed is an unmarked copy for your convenience.

The enclosed form of the proposed ordinance has been placed in our word processing equipment. Consequently, any changes or additions you wish to make can be easily accommodated. As we discussed, the enclosed form should be considered as an internal working draft so that we can reach an agreed proposal to present to the city.

Plaintiff's Exhibit 14. A week later he wrote another letter recounting that they had met on this franchise ordinance, and noting their discussions of various provisions of this proposed ordinance, including the provision with respect to the percentage of the City's interest in the gross revenues from the ordinances:

Enclosed is a revised form of CATV ordinance with the changes we discussed at our last meeting in Section 8.G; Section 10.B; Section 11.D; Section 12.H, J, and M; and Section 23.A.

Also enclosed is a suggested revision to Section 20.A regarding the three percent of gross revenue issue in the event we are unsuccessful in limiting the franchise fee to regular subscriber service.

If you have further comments or suggestions regarding this proposed form of ordinance, please let me know.

Plaintiff's Exhibit 15. None of the referenced sections of the proposed ordinance relates to boundaries.

In October 1978, Runnells and others met with Mayor McConn. At that meeting, Runnells was informed that McConn wanted Westland to have a franchise. Westland had applied for a portion of the area sought by Gulf Coast, and the Mayor indicated to Gulf Coast that a general area, Westbury-Meyerland, was what he wanted Westland to have. Testimony of Clive Runnells; Testimony of James McConn.

On November 22, 1978, notice of the November 29th City Council agenda indicated that six (6) ordinances, five of which ultimately were approved, would be considered. On November 27, 1978, the attorney for Houston Cable, one of the applicants scheduled on the upcoming agenda, sent a final proposed cable television ordinance to the City Attorney:

Enclosed is a revised form of the proposed cable t.v. ordinance which includes the modifications made this week-end.

In order to meet the proposed time schedule, any further revisions must be agreed by 12 noon on Tuesday, November 28. Final proofing of the enclosure will be completed by that time.

Plaintiff's Exhibit 29. He also sent a copy of the ordinance to Gulf Coast's attorney, who had discussed it with the lead counsel for Houston Cable earlier that morning:

Enclosed is the proposed cable t.v. ordinance which Jonathan Day discussed with you this morning. Also enclosed is a copy of the transmittal letter to the City attorney.

I have marked significant changes in red in order to facilitate your review. If you have any questions or comments, please let me know.

Plaintiff's Exhibit 30. The next day Houston Cable's attorney sent copies of the ordinances to the ultimately successful applicants. The proposed ordinances were complete except for the names of the applicants and their proposed service area. Plaintiff's Exhibits 32 & 189. The successful applicants then filled in the blanks with their names and service areas, and forwarded the ordinances to the City Attorney.

Some applicants sent their proposed ordinances back to the Houston Cable Attorney who then forwarded them to the City. Plaintiff's Exhibit 35.

The agenda for the City Council meeting of November 29, 1978 contained six (6) cable television franchises, not including plaintiff's, Plaintiff's Exhibit 33; those ordinances had been placed on the agenda on or before November 22, 1978, Plaintiff's Exhibit 174. When Affiliated attorney Levin heard of this, he contacted Assistant City Attorney Adrian Baer. Baer relayed the following information to Levin:

[T]he Mayor and City Council had made their decision, and [Baer] said, 'I learned this directly from the Mayor, the franchises are non-exclusive, he does not know about the areas, it's still being worked out by Williams and Baer ... so the net result will be a de facto exclusive.

He [,Baer,] explained to me that there were— the decisions as to who was going to get what areas, specifically in terms of the actual boundaries, were still under negotiations, but the decision as to who was fait accompli.

Testimony of Al Levin;. Plaintiff's Exhibit 106.

After an on-site inspection of Gulf Coast's Bellaire facilities, Sadowski, the consultant hired by the City of Houston, told Earle, Director of Public Service, and Baer, Assistant City Attorney, that he would reject Gulf Coast's application. The next morning, Sadowski was fired. One day later a messenger from Earle retrieved the notes Sadowski had made concerning the applications. In his notes, Sadowski had not recommended that Gulf Coast's application be rejected, in spite of his oral suggestion to that effect to Earle and Baer, and he testified that he would have made no substantive changes in his report after the visit to Gulf Coast's facilities. He had recommended in his report, however, that Gulf Coast be given a smaller franchise area than that for which it had applied. When Sadowski's notes were typed by someone in the City, that recommendation was deleted. Moreover, other significant changes were reflected in the typed version of the notes Sadowski had turned over to Earle's messenger: his recommendations that Houston Community Cable, Houston Cable, and Columbia (Westland) be rejected were changed to recommendations that they should continue to be considered; and his statement that Cablecom had presented the only satisfactory application was omitted. Testimony of Robert Sadowski.

Prior to the plaintiff's hearing before City Council on December 12, 1978, McConn suggested to Goldberg that Affiliated seek a franchise in another area of the City rather than in the area sought by Gulf Coast. McConn testified as to his motivation for the suggestion: "I

thought that, in trying to really help Mr. Goldberg, it was pretty obvious to me that Gulf Coast had the muscle and that Mr. Goldberg did not."

At the City Council hearing on plaintiff's application which was conducted on December 12, 1978, the following comments were made by Councilman Goyen:

Mr. Goldberg, let me address Council's wisdom. As these applications came in, they were sent to the Legal Department. Obviously, a number of lawyers got together and did whatever they did. I was not privy to it nor did I want to sit in on any meeting.

Apparently, they came up with the formula that those applicants agreed upon. I was hoping that your situation might end up in the same pot as the others, whereby there would be some kind of recommendation coming before this Council, and this Council would not have to carve from one to give to another, which we have not had to do in the past and which I do not want to do now nor do I intend to.

I do not want to taketh away and giveth to somebody else, because I haven't had to do that in the past. You have a very competent attorney, and the other people have very competent attorneys. What I would like to see done, and it might take a motion to get this done, is to send this to the Legal Department and try to work something out.

Plaintiff's Exhibit 150 at 27–28. Subsequently, the Council discussed how to proceed with plaintiff's application, and Councilman Mann made the following suggestions:

I want to make a substitute motion that the [plaintiff's] application be referred to the Legal Department, and they in turn can contact these other applicants who have come forward and see if they can work out something.

. . . .

If you take this, fine, then see how much Gulf Coast is going to knock off this other group on farther down and then around and around.

. . . .

Substitute motion that this application be referred to the Legal Department and Public Service, and they are to contact the other people that have ordinances and guarantee that these boundaries are being adjusted between them, and they report back to Council.

Plaintiff's Exhibit 150 at 37, 39, 40.

Also at that hearing, Mann indicated his knowledge of a house-count survey that had been conducted by Gulf Coast. Plaintiff's Exhibit 150 at 25. The survey resulted in a comparison between the area plaintiff was applying for and an area that was within Houston Cable's application, Plaintiff's Exhibit 84, and was conducted in conjunction with a proposal by Gulf Coast that if Houston Cable would give

cluded that plaintiff had failed to demonstrate that its injury was caused by anything other than defendants' boundary agreements. Thus, there was no evidence to support interrogatory five.

[T]he agreements to allocate and divide territory cannot be considered as evidence proving causation of plaintiff's injury, and no other evidence in the record, either direct or inferential, provides the necessary connection between the second theory of conspiracy to exclude non-conspirators and the plaintiff's failure to receive a franchise.

The testimony elicited by plaintiff from its expert witness further demonstrates that what plaintiff established was a causal relationship between the applicants' agreements to eliminate overlaps in territory and the plaintiff's failure to

be awarded a franchise, rather than a relationship between the agreement to exclude non-conspirators and plaintiff's injury.

Record on Appeal, vol. 9 at 1846.

## IMPACT ON COMPETITION

It is abundantly clear from the record of this case that a group of Houston businessmen decided to ensure the receipt of cable television franchises by agreeing to seek separate parts of the city. That they joined together at least with the blessing of the Mayor, if not at his behest, is also certain.[7] In order to fully comprehend the devastating impact on competition occasioned by this gentlemen's agreement, we digress briefly to set out an important characteristic of the cable television industry presented by Gulf Coast.

A Yes, sir. I don't know if I said that, but I'll say it now.

Testimony of James McConn.

Councilman Goyen testified by deposition that he would have voted for Affiliated Capital's application if "on the 20th, Mr. Goldberg had come in and Mr. Runnells had come in, Mr. Mischer had come in, and all the principals had come in, and a piece of Houston had been carved out for Mr. Goldberg with no objection by anybody." Councilman Robinson testified that he would have supported Affiliated Capital's application if plaintiff had been able to work something out with Gulf Coast to give him what he wanted. Councilman Westmoreland testified that he did not disagree with his prior deposition testimony that Affiliated had been unable to work out any type of arrangement with Gulf Coast, and for that reason Westmoreland voted in favor of Gulf Coast.

Finally, plaintiff's expert witness, Martin Malarkey, testified at length about the detrimental results of the noncompetitive franchising process in Houston, and about the benefits to residents of other cities where the process has involved competition on the merits of the applications. According to his testimony, the benefits include lower rates, provisions for sanctions in the event of noncompliance by the franchisee, provisions for performance bonds, and provisions requiring city approval prior to changes in ownership or control of the franchises. Further, he testified that normally the city itself prepares the franchise ordinance, rather than allowing applicants to do so.

519 F.Supp. at 1000-05 (footnotes omitted).

---

the identified area to Gulf Coast, then Gulf Coast would be willing to give plaintiff its area. Testimony of Al Levin. A document, prepared sometime between November 28, 1978, and December 20, 1978, by Assistant City Attorney Baer bears an alternative boundary description for the Gulf Coast franchise including the Houston Cable area, with Baer's notation: "I-10 line shifted to Hwy. 290 without Goldberg's tract—contingency." Plaintiff's Exhibit 56.

City Council favored Gulf Coast's franchise, which subsumed the area plaintiff had applied for, and at trial several councilmen and Mayor McConn testified as to their reasons therefor. McConn's concern was to keep politically influential groups content:

Q You didn't want to step on anybody's political toes, did you?

A Not if I could avoid it.

Q You didn't want to make any type of political decision where some powerful person like Walter Mischer would be unhappy, did you?

A Not if I could avoid it.

Q And if all of the parties could work things out, then you wouldn't have to make any type of decision, other than approving their agreements, isn't that correct?

A Yes, generally that is correct, yes, sir.

Q And isn't that what you wanted to happen?

A That would have been beautiful, if it could have happened that way.

Q But when it didn't happen and you had to make the choice between Southwest Houston and Gulf Coast, you stated that the other— you thought the other people were more politically powerful than Southwest, isn't that correct?

7. Record on Appeal, vol. 12, at 450.

Defendant Gulf Coast asserts that cable television, like the electric utility, is generally considered a natural monopoly. According to the common wisdom, the extremely high fixed costs incurred in preparing a cable television company for operation prevent the survival of competition in the marketplace. Plaintiff's expert witness on the cable television industry admitted that it did not make economic sense to grant franchises with overlapping boundaries. Record on Appeal, vol. 35, at 28. The economies of scale do not approach those of electric utilities but the theory for both industries holds that the long-run average costs tend to fall as output increases. We assume for purposes of this discussion that cable television is indeed a natural monopoly and proceed to discuss the pernicious effects of the conspiracy given this factor.

Defendant Gulf Coast argues that since cable television is a natural monopoly and competition within franchise areas is impractical, the division of territories caused no harm. The boundary agreements did nothing more than conform to an important characteristic of this industry. In reality, however, the impact of these agreements is all the more devastating precisely because a natural monopoly is involved.

If there is to be no competition within a given territory, competition is only possible before the franchise is granted. Unfortunately for both Affiliated Capital and the citizens of Houston, there was no competition between the corporations that received franchises. The result was lower quality, higher priced cable television for Houston.[8]

Plaintiff's expert witness, Martin Malarkey, compared the Houston cable television ordinance with those of a number of Texas cities.[9] He testified that while no performance bond was required in Houston, it was common practice to require one. With regard to rates, the Houston ordinance states that rates can be changed upon sixty days' notice unless the city suspends them by calling a public hearing. The other cities do not countenance this practice of allowing the companies to make the first move toward rate increases. Franchise fees are also lower in Houston because the city receives three percent of gross revenues *excluding* revenues from connections, reconnections, and sale or rental of equipment. Each customer must rent a converter for the price of $2.50 per month. When this amount is calculated for 100,000 subscribers over a year's time, the resulting sum equals a substantial loss for city coffers.

In addition to opining about the relative merits of the Houston ordinance, Malarkey also noted that the procedure employed in Houston did not even permit an adequate determination of the merits of each application. He stated that the city did not adequately review the financial qualifications of the applicants.[10] He also asserted that all of the applications were woefully substandard.[11]

By far the most searing indictment of the procedure comes from a simple comparison of the requirements of the 1973 and 1979 ordinances, as the following colloquy with the expert witness demonstrates:

Q Sir, as a further benchmark of the Houston franchising process in 1978, did I ask you to compare the franchise ordinance awarded by the City of Houston in 1973 with the ordinance awarded in '79?

A Yes, sir, you did.

Q If you had consulted for the City of Houston in 1978, would you have made this comparison as a matter of course?

A Yes, sir.

Q All right. Was the '73 ordinance, Mr. Malarkey, awarded by Houston in certain respects a better deal for the Houston consumers than the '79 ordinance?

A Yes, it was.

Q Did the '73 ordinance require a performance bond?

---

8. Record on Appeal, vol. 34, at 23–27.

9. Record on Appeal, vol. 34, at 13–26.

10. Record on Appeal, vol. 33, at 53–54.

11. Record on Appeal, vol. 33, at 58–59.

**235**

A It did.

Q In what amount?

A $1 million, as I recall.

Q Did the '79 ordinance require a performance bond?

A No, sir.

Q Did the '73 ordinance require free connections for city buildings, schools and colleges?

A Yes, sir, it did.

Q Did the '79 ordinance require such free connections?

A No, sir.

Q Did the '73 ordinance require commencement of construction within 90 days after obtaining all necessary permits, licenses and certificates?

A Yes, it did.

Q Did the '79 ordinance have that type of construction commencement schedule?

A No, sir, it did not.

Q Did the '73 ordinance require that the 3 per cent franchise fee be paid to the city based upon all revenues, including revenues from the sale or rental of converters?

A It required payment on all revenues.

Q Did the '79 ordinance require payment on all revenues?

A No, sir, it did not.

Record on Appeal, vol. 34, at 27–28.

## PER SE RULE

 Section 1 of the Sherman Act proscribes "[e]very contract, combination . . . or conspiracy in restraint of trade or commerce . . . ." As the myriad of cases which interpret those words make clear, it is not *every* agreement in restraint of competition that is prohibited since almost every contract has that effect to some extent. In fact, most agreements are analyzed under the rule of reason.[12] This rule obliges a court to consider whether the particular agreement places an unreasonable restraint on competition.

However, as the Supreme Court declared very recently in *Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982),

> [t]he elaborate inquiry into the reasonableness of a challenged business practice entails significant costs. Litigation of the effect or purpose of a practice often is extensive and complex. *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5 [78 S.Ct. 514, 518, 2 L.Ed.2d 545] (1958). Judges often lack the expert understanding of industrial market structures and behavior to determine with any confidence a practice's effect on competition. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 609–610 [92 S.Ct. 1126, 1134–1135, 31 L.Ed.2d 515] (1972). And the result of the process in any given case may provide little certainty or guidance about the legality of a practice in another context.

*Id.,* at 609, n. 10 [92 S.Ct. at 1134, n. 10]; *Northern Pac. R. Co. v. United States, supra* [356 U.S.] at 5 [78 S.Ct. at 518].

The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of *per se* rules. Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a

---

12. In *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), Justice Brandeis set forth the following classic statement of the rule of reason:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. at 238, 38 S.Ct. at 244.

conclusive presumption that the restraint is unreasonable. As in every rule of general application, the match between the presumed and the actual is imperfect. For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable.

102 S.Ct. at 2472–73 (footnotes omitted).

■ A limited number of practices have been condemned by *per se* rules.[13] The Supreme Court, in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), declared that "[o]ne of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." 405 U.S. at 608, 92 S.Ct. at 1133. Such agreements have been classified as naked restraints of trade. A long line of cases stretching back to the nineteenth century has condemned market division. *E.g., Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *Gainesville Utilities Department v. Florida Power and Light Co.,* 573 F.2d 292 (5th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978).

Defendants argue vigorously against a *per se* analysis in the instant case. They concede that horizontal market division is a *per se* violation of section 1. The boundary agreements in this case, however, had no effect until they received the City Council's stamp of approval. This vertical characteristic, defendants assert, must take this case outside the *per se* rule.[14]

■ It is true that this Court has applied the rule of reason to cases involving vertical territorial restrictions. *Joe Mendelovitz v. Adolph Coors Co.,* 693 F.2d 570 (1982). Vertical territorial restrictions cannot be condemned with the certainty of their horizontal counterparts. As the Supreme Court recognized in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977),

[t]he market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intra-brand competition and stimulation of interbrand competition.

433 U.S. at 51, 97 S.Ct. at 2558 (footnotes omitted).

■ There is no question here, as there is in a vertical territorial restraint case, of a stimulation of competition. The agreement between the conspirators to "cut the pie" served only to eliminate competition from other applicants such as Affiliated. As Mr. Justice Hughes recognized in *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933), "Realities must dominate the judgment.... The Anti-Trust Act aims at substance." 288 U.S. at 360, 53 S.Ct. at 474, *quoted in Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. at 47, 97 S.Ct. at 2556. The conspiracy charged in this case is the classic horizontal territorial restraint for which the *per se* rule was designed. The fact that the Mayor and City Council were involved is of no moment except as it relates to the immunity questions with which we must now deal.

Although the district court grounded its grant of judgment on the lack of causation

---

**13.** "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (citations omitted).

**14.** Defendant Gulf Coast also asserts that a *per se* analysis is inappropriate "in this 'market' for franchises where nothing is being bought or sold in the normal sense ...." Defendant's Brief at 26–27. In response, plaintiff notes that one of the oldest, most frequently cited cases involving territorial market division dealt with a similar practice. *See Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136] where the Court condemned an agreement between pipe manufacturers to divide territories and apportion the business among themselves. We reject defendant's proffered distinction.

evidence, the court went on to consider the applicability of the immunity/exemption doctrines which could have precluded liability even if an antitrust violation had been established. The lower court rejected the applicability of these doctrines, and we adopt that portion of the district court's opinion. *Affiliated Capital Corp. v. City of Houston,* 519 F.Supp. at 1012–1029.[15]

Mayor McConn argues strenuously that a recent Supreme Court decision, *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), guarantees his immunity from liability. That case announced that qualified or "good faith" immunity for public officials would be judged solely by an objective inquiry. The Court found that the subjective inquiry had proven unworkable:

> The subjective element of the good faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment. And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.
>
> In the context of *Butz*'s attempted balancing of competing values, it now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments sur-

rounding discretionary action almost inevitably are influenced by the decision-maker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broadranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.

102 S.Ct. at 2737–38 (footnotes omitted). The Court held that

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

102 S.Ct. at 2738.

■ McConn contends that the state of the law regarding a municipal official's liability for antitrust violations was unsettled in 1978. Since he could not have known that he would be liable for violating the antitrust law, the argument continues, he is entitled to qualified immunity. This argument is based upon a misinterpretation of the Supreme Court's statement. It is not relevant whether the official knows he can be held liable for a particular violation of the antitrust law, only whether a clearly established violation exists. As stated throughout this opinion, territorial market division has long been recognized as a violation of the antitrust law. McConn cannot escape liability on this basis.

## CONCLUSION

For the reasons set forth, we conclude that the territorial market division charged is a *per se* violation of section 1 of the Sherman Act. The boundary agreements

---

**15.** We note that the city of Houston was dismissed as a party to this action, with the con-

currence of plaintiff.

certainly prevented plaintiff from securing a cable television franchise. We are constrained, therefore, to reverse the judgment of the court below and reinstate the jury's verdict of $2,100,000 in damages.

REVERSED.

CLARK, Chief Judge, dissenting:

I respectfully dissent.

The majority presumes that cable television franchises are natural monopolies. Based on this assumption, it further presumes that competition is only possible before a franchise is granted. On these two presumptions, the court then erects a third—that the rule of reason would so certainly condemn an agreement to divide areas of cable television service in a single city that, for sake of efficiency, the agreement must be ruled invalid *per se*. These presumptions are not just unwarranted, they are contrary to proof in this record about the particular business of cable television franchising in Houston, Texas.

This case does not concern price fixing. Nor does it present a case of a group boycott, tying arrangement or a horizontal division of markets (though each of these categories has not invariably been held to be a naked restraint of trade). No applicant proposed to serve the whole city of Houston. The Council would not have accepted such an application. Therefore, the relevant geographic market for potential franchisees here is not the city of Houston, but some part or area thereof. No absolute *per se* category is presented. Absent the majority's presumptions, there is no way for me to predict with confidence that the rule of reason will condemn the present boundary agreements between franchise applicants which this jury found reasonable. Thus, I cannot say that the conduct of the applicants for franchises in this case is manifestly anticompetitive.

Under the district court's instructions, the jury was asked: Was the agreement of defendant, Gulf Coast, with other companies to allocate cable television franchise territories part of a conspiracy which constituted an unreasonable restraint of trade?

The jury said no. The trial court who heard the witnesses and took the evidence found this answer was supported by the record. The majority does not controvert this. Rather, it acknowledges that the political history of cable television in Houston shows Houston voters rejected a single "monopoly" cable television franchising effort in 1972, and that the mayor's anxiety to avoid a similar situation in 1978 led to the city's demand for multiple franchises. Every applicant, including plaintiff, accepted this requirement.

Instead of analyzing the impact of these facts, the majority chooses to rely only on the theoretical testimony of the plaintiff's aptly named expert to create a series of presumptions. From other proof, a reasonable jury could have found the mayor's political concern, and a concomitant refusal by the Council to get into actually drawing boundary lines, dominated the actions of the applicants and produced a reasonable boundary agreement. Also, the jury could have found from the proof that a reasonable way to secure multiple franchises was to tell all prospective franchisees that applicants must define individual service areas without gaps and without overlaps.

There is no showing that plaintiff or any other potential applicant was limited as to formation of its own group of bidders. All those who wanted franchises were faced with the city's ukases that no single citywide franchise would be granted and that the Council would not draw lines. There was an opportunity for competition in the pre-award area, even for those who started as late as plaintiff. They could have become members of a new group of bidders or tried to attract members of the existing group to go with them. Moreover, the proof shows the city could reject any part or all of any area sought when the matter came before the Council for approval. No testimony suggested that plaintiff did not have an opportunity to urge the city to require changed boundaries to make room for its tardy entry. Indeed, it did so and a request for accommodation was made. Thus, the mere fact that Gulf Coast refused Gold-

berg's demand that it give up a substantial part of the area the agreement allowed it to request was not enough to require the jury to find the boundary agreement kept plaintiff from competing.

There is another pro-competitive aspect of the proof that even more clearly argues against the imposition of a *per se* rule to this particular territorial agreement. The statements of plaintiff's president, Billy Goldberg, to the city Council told the jury how competition would work between franchised areas *after* they were awarded.

"In determining the geographical breakdown of cable TV franchise areas it is my judgment that this Council is wise awarding multiple franchises throughout the city. I will say a little bit more on that at a later time.

"Conceptually, the notion of a smaller, more responsive franchise is likely to be substantially more acceptable to this community. Careful thoughts should be given to the proposition that no one applicant should receive more area to serve than could be constructed and energized within a reasonable period of time.

. . . .

"It seems to me that . . . our application for this area is more in keeping with the wishes of the people of this community previously expressed, where they indicated to me, and I think to everyone, the desire not to have the vast territories of our city under one operation, and there's a reason for it. There's a reason of competition.

". . . [L]et me tell you where the competition comes in.

"If this Council does as I think it will do, divide this city up into as small portions as possible, you will have various cable companies throughout the city, and everybody in the city knows what the other fellow is doing. He's either got a friend or a relative over there, and they will be saying, 'Well, why is it, Mr. Goldberg, that your system and Affiliated's system doesn't have so-and-so, and if you go to the other part of town they have that service,' and that's where the area of competition comes in, and I think it's healthy."

Franchise areas, levels of service, and fees were not immutable. If a franchisee's level of performance did not keep pace with neighboring cable companies, all sorts of post-franchise problems could occur, up to and including another referendum to undo everything.

I do not understand how an appellate court can erect the majority's pyramid of presumptions based on one expert's opinion, contradicted by his own employer, and allow it to overcome a factfinding by a jury that finds support in the record.

Because I believe that the jury validly found that the agreement to submit non-overlapping bids met the rule of reason, I am further compelled to agree with the district court that the finding that any later conspiracy to refuse plaintiff's request to participate in the agreement could not have caused plaintiff harm. The interrogatories on separate conspiracies were put separately at plaintiff's insistence to accord with its theory that separate conspiracies were proven. What turns out to have been a tactical mistake should not be allowed to bootstrap to credibility a verdict that the proof establishes was unwarranted. This is especially true where the appellate device for the levitation is supplied by unsupported presumptions of wrongdoing.

The proof tells me, just as it told the jury, that those who wanted to seek a cable television franchise in Houston in 1978 knew the only way to get one was to agree with others on boundaries for multiple service areas that would cover the city without overlaps. The jury found that after the group had validly made these agreements, plaintiff sought to have the group redo its plans and was improperly rebuffed. The district court reasoned that the failure to get a franchise was solely the result of the valid agreement, not the invalid rebuff. So do I.

At a time when the clear trend in antitrust law is away from the use of the "expedient" *per se* rule, except for price-fixing, and toward proving the truth of

**240**

particular transactions, it seems altogether wrong to rely on speculative malarkey to assume that a conspiracy to restrain trade existed.

I would affirm the district court.[1]

---

1. As an aside, and because the majority's holding required that it address the *Noerr-Pennington* doctrine, I would briefly point out that the district court's analysis of this issue (the only analysis on which the majority relies) necessarily depends on a fact determination that the city and mayor participated in a conspiracy to unreasonably restrain trade by requiring defendants to agree on territorial boundaries. In adopting this reasoning, the majority overlooks the same basic premise missed by the district court. This judicial fact-finding is antithetical to the district court's determination that adequate proof supported the jury's finding to the contrary. That the decision-makers may have been members of a later conspiracy to refuse to change boundary lines does not affect their administrative position vis-a-vis the initial agreement.