Robert S. **BUBIS**

v.

Leonard Ray **BLANTON, et al.**

No. 3–83–0415.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 27, 1988.

Richard J. Braun, Thompson & Bussart, Nashville, Tenn., for plaintiff.

John S. McLellan, Kingsport, Tenn., for defendant Leonard Ray Blanton.

Tyree B. Harris, Nashville, Tenn., for defendant James M. Allen.

## MEMORANDUM

HIGGINS, District Judge.

On May 27, 1983, the plaintiff, Robert Steven Bubis, filed this action against the defendants, Leonard Ray Blanton, James M. Allen, S.J. King, Clyde Edward Hood, Jr., Robert O. Frensley, Jack Ham, James B. Ham, Robert E. Townes and Charles S. Rollins. The plaintiff alleges that the defendants engaged in a combination and conspiracy in unreasonable restraint of interstate commerce in the retail liquor industry in Davidson County, Tennessee, in violation of the Sherman Act, 15 U.S.C. § 1. The plaintiff contends that he was injured in his business and property as a result of the defendants' unlawful conduct and is entitled to damages pursuant to 15 U.S.C. § 15. The plaintiff further alleges that the defendants conspired to conduct and participate in the affairs of the Tennessee Alcholic Beverage Commission (ABC) through a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Statute (RICO), 18 U.S.C. § 1961, *et seq.*

The plaintiff filed an amended complaint on November 7, 1986, dismissing the defendants, James B. Ham and Charles S. Rollins. Stipulations of dismissal were entered as to the defendants, Robert O. Frensley (order entered April 9, 1984); Clyde Edward Hood, Jr. (order entered September 26, 1984); Robert E. Townes (order entered October 18, 1984); Jack Ham (order entered November 6, 1986) and S.J. King (order entered January 7, 1987).

This action was tried against the remaining defendants, Leonard Ray Blanton and James M. Allen, on August 17 through August 21, 1987, without the intervention of a jury.

At the close of the plaintiff's proof, the plaintiff conceded that the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292

(1987) vitiated the plaintiff's RICO claim. The Court dismissed the plaintiff's RICO claim at that time.

The plaintiff's sole remaining claim against the defendants is for illegal restraint of trade pursuant to 15 U.S.C. § 1 and 15 U.S.C. § 15. For the reasons set forth below, the Court finds that the defendants engaged in a conspiracy in unreasonable restraint of interstate commerce in violation of 15 U.S.C. § 1. However, the Court further finds that the plaintiff does not have standing to bring this action under 15 U.S.C. § 15. Accordingly, this action is dismissed.

## I.

The plaintiff alleges that the defendants engaged in a conspiracy to control the issuance and/or transfer of liquor licenses in Davidson County, Tennessee, in an unlawful restraint of interstate commerce in violation of 15 U.S.C. § 1, which provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.

At trial, the Court found that there was sufficient evidence of the existence of a conspiracy to justify passing upon the full merits of the case as required by *U.S. v. Vinson*, 606 F.2d 149 (6th Cir.1979). The Court must now determine this issue by a preponderance of the evidence.

The principal witness relied upon by the plaintiff to establish a conspiracy was Mr. Jack Ham. Mr. Ham testified that he met the defendant, Mr. Blanton, when they were both engaged in the construction business, more than twenty years prior to the commencement of the alleged conspiracy. Mr. Ham testified that he contributed to Mr. Blanton's campaign for governor in 1974 and in connection with that campaign met the defendant Mr. Allen and Clyde Edward Hood, Jr., both of whom became special assistants to Mr. Blanton when he became governor in January, 1975. The defendant, Mr. Allen, left his position as a general consultant to the governor in June,

1975. Mr. Hood remained special assistant to the governor until November, 1977.

Mr. Ham testified that shortly after the Tennessee Supreme Court decision in 1975, which permitted the expansion of liquor stores into suburban areas, he and Mr. Hood discussed the possibility of becoming partners in two liquor stores. Mr. Ham further testified that Mr. Hood suggested that they offer Governor Blanton an interest in the liquor stores. He also testified that he and Mr. Hood discussed the necessity of putting Mr. Hood's interest in the name of a nominee because Mr. Hood was still on the governor's staff.

Mr. Ham testified that sometime after his discussion with Mr. Hood, he met with the governor in the governor's office and offered the governor a 20 percent interest in the two proposed liquor stores. According to Mr. Ham, although the governor did not respond affirmatively to the proposal, he did not respond negatively, ask Mr. Ham to leave, or report the conversation to the law enforcement authorities. Mr. Ham testified that Mr. Blanton's only response was to the effect that it was "good politics" if a license was acquired that there not be any other liquor stores competing in the area and that he was a good politician. Mr. Ham testified that he left the governor's office with the understanding that he and the governor had an agreement and that pursuant to that agreement Mr. Ham would receive at least one liquor license in an area without any competitors.

Mr. Ham testified that he apprised Mr. Hood of his conversation with the governor and that he and Mr. Hood then decided upon locations for the proposed liquor stores.

Mr. Ham testified that before any licenses were granted, he and Mr. Hood approached Robert O. Frensley about acquiring a potential liquor store together. Mr. Ham further testified that Mr. Hood told Mr. Frensley that 20 percent of the store would belong to the "administration" and that the profits from that 20 percent interest would go to "the man."

Mr. Ham testified that at another meeting with the governor, the governor informed Mr. Ham that another individual, Earl Shacklett, wanted a license for a liquor store in one of the areas that Mr. Ham had selected for his potential stores. Mr. Ham testified that the governor told him to discuss the proposed Shacklett license with Gene Blanton, the governor's brother. According to Mr. Ham, Gene Blanton explained to him that Mr. Shacklett had been a strong supporter of Governor Blanton's campaign and that it was very important not to upset him. Mr. Ham testified that he agreed to let Mr. Shacklett have the license in the area that he had originally selected and he agreed to choose another location.

Mr. Ham testified that sometime prior to the issuance of the new liquor licenses by the ABC in April, 1976, he and Mr. Hood met with Lee Hyden, an official of the ABC, and discussed the potential locations of their proposed liquor stores.

Mr. Ham further testified to yet another conversation with Governor Blanton in which the governor advised Mr. Ham that some other people involved with the administration thought that Mr. Ham should not be permitted to have two liquor stores. Mr. Ham testified that he discussed this conversation with Mr. Hood and that Mr. Hood suggested that he see the defendant, Mr. Allen, and get things settled.

Mr. Ham testified that he and Mr. Hood had a meeting with the defendant, Mr. Allen, in Mr. Allen's office. Mr. Ham testified that Mr. Allen stated that he was interested in a license in the Green Hills area, an area which Mr. Ham had selected as a potential location for his prospective store. Mr. Ham testified that during the conversation with Mr. Allen, either he [Mr. Ham] or Mr. Hood stated that the governor was getting 20 percent of Mr. Ham's store. Mr. Ham further testified that Mr. Allen stated that if Mr. Ham would select another location and let Mr. Allen have Green Hills, Mr. Ham would not have to pay the governor anything. Mr. Ham testified that he and Mr. Allen finally agreed that Mr. Allen would purchase an option that Mr. Ham held on a potential location for a liquor store on Kenner Avenue and that Mr. Ham would keep the Green Hills area.

Mr. Ham testified that after his conversation with Mr. Allen he had another conversation with Mr. Hood. He testified that Mr. Hood told him that from then on, instead of a 20 percent fee, the new liquor stores would pay a 30 percent consulting fee, of which Mr. Hood would receive 16 percent and the administration would receive 14 percent.

In April, 1976, the ABC granted Mr. Ham's application for a liquor license in the Green Hills area. However, Mr. Ham never opened a liquor store in that area. Mr. Ham testified that when other licenses and transfers were issued and approved in the Green Hills area, he became upset because he understood that Green Hills would be his location and, therefore, free from competition. Mr. Ham testified that he discussed his concerns with Governor Blanton and asked the governor to permit him to move to a location on Donelson Pike. Mr. Ham testified that he later had a meeting with Mr. Hood, who told him that the governor asked him to "take care of" Mr. Ham. According to Mr. Ham, Mr. Hood told him that even if he received the transfer, the governor would still retain a 20 percent interest in Mr. Ham's store. Mr. Ham testified that he told Mr. Hood that he wanted to insure that there were no competitors in the area. According to Mr. Ham, he and Mr. Hood then met with the governor, he again requested to transfer his liquor license to the Donelson Pike area and the governor asked Mr. Hood if Mr. Ham's proposed transfer could be accomplished. Mr. Ham testified that Mr. Hood responded affirmatively. Subsequently, Mr. Ham applied for a transfer to the Donelson Pike area, and his transfer was approved by the ABC on July 12, 1977.

Mr. Ham testified that he arranged to pay Governor Blanton by paying off a $38,-000.00 loan which the governor had at the Commerce Union Bank. Mr. Ham testified that he accomplished this by purchasing oil stock from the defendant Mr. Blanton. Mr. Ham testified that he did not investi-

gate the value of the stock and that he later sold the stock for $300.00 and took a capital loss. Mr. Ham further testified that of the $38,000.00 which he paid to the bank, $15,000.00 was a finder's fee for a construction loan which Governor Blanton helped Mr. Ham to obtain.

Mr. Ham also testified that in 1978 Robert O. Frensley approached him to discuss Mr. Frensley's interest in operating a liquor store in the Opryland Hotel. Mr. Ham testified that Mr. Frensley told him that he recognized the area as Mr. Ham's and that Mr. Frensley offered him 25 percent of the profits of the proposed store in exchange for the opportunity to open a store at the Opryland Hotel.

Mr. Ham further testified that his application for a liquor license contained untrue statements and that he lied when federal agents first investigated him to cover up his involvement in the scheme with the governor and others.

On cross-examination, Mr. Ham testified that he also made untrue statements in his testimony before the Federal Grand Jury. For example, he told the Grand Jury that he had paid Governor Blanton $5,000.00, but he later recanted that statement. Mr. Ham also testified that Governor Blanton never accepted Mr. Ham's proposal that he pay the governor 20 percent of the profits of his store or guaranteed that Mr. Ham would receive a liquor license by any express statements. Finally, Mr. Ham testified that Governor Blanton never examined his books or discussed his profits with him.

Bert Ham, Jack Ham's nephew, who had been employed in Jack Ham's liquor store, was also called as a witness by the plaintiff. Bert Ham testified that Jack Ham had told him that he had an arrangement with the governor and that the governor owned part of his liquor store. Bert Ham also testified that he was present when Mr. Hood and Jack Ham discussed paying Governor Blanton his share of the liquor store's profits by paying off Governor Blanton's loan at the Commerce Union Bank through the purchase of oil stock. Bert Ham testified that Mr. Hood advised against the proposed method of payment.

On cross-examination, Bert Ham testified that Governor Blanton was never involved in the day-to-day operations of Jack Ham's store. Bert Ham also testified that neither he nor, to the best of his knowledge, Jack Ham, wrote checks on the liquor store account or paid cash from the liquor store profits to Governor Blanton.

Mr. S.J. King, the chairman of the ABC in 1976 and 1977, and a Blanton appointee, was called as a witness by the plaintiff. Mr. King testified that at a meeting in the governor's office concerning liquor licenses —attended by Messrs. Hood, Allen, Gene Blanton, Lee Hyden[1], and Governor Blanton,—Mr. King suggested that Governor Blanton contact Mayor Fulton to discuss the new policy for the issuance of licenses in order to avoid controversy. Mr. King also testified that at another meeting in the governor's office, the governor told Messrs. King and Hyden that "Waldo" would determine who would receive liquor licenses and that Mr. Hyden would have nothing to do with those determinations.[2] Mr. King further testified that prior to an ABC meeting he received a list from Mr. Hyden which contained twelve names of persons who were recommended for liquor licenses. Mr. King testified that he voted for the twelve recommended by Hyden even though he believed that someone other than Mr. Hyden had determined the twelve to be recommended.

Mr. King also testified that he was contacted by Robert Townes, Governor Blanton's patronage chairman for Davidson County, and that Mr. Townes offered him a 25 percent interest in his liquor store. Mr. King testified that he advised Mr. Townes

1. Lee Hyden was the executive director of the ABC. *See supra*, p. 1494.

2. The Court finds that "Waldo" is Ralph Waldo Emerson, Mr. Blanton's administrative assistant during his term in Congress. *See infra*, p. 1498. The Court finds that by this action Governor Blanton effectively took control of the ABC. The Court further finds that in acquiescing to Governor Blanton's directive, Mr. King simply abandoned the sworn responsibilities of his office.

that he could not have an interest in the liquor store in light of his position with the state, but suggested that a friend of his, Charlie Rollins, who later became his son-in-law, might be interested in part ownership of the store. According to Mr. King, Mr. Townes told him to pick up a partnership agreement at the defendant Allen's office. Mr. King testified that he went to Mr. Allen's office and picked up a partnership form from Mr. Allen himself.

Mr. King testified that shortly before the ABC approved Jack Ham's transfer from Green Hills to Donelson Pike, Mr. King was contacted by Mr. Hood and was told to approve the Ham transfer because Mr. Ham's store was partly "the Chief's" and because Mr. Ham was "getting on" the governor. Mr. King also testified that the governor asked him to get Mr. Ham "off his back." Mr. King testified that, influenced by his conversations with Mr. Hood and Governor Blanton, he voted for Mr. Ham's transfer. Mr. King also testified that although no one told him in express terms not to permit any other stores to move into the Donelson Pike area, he knew that he was not to approve any licenses which would compete in that area.

On cross-examination, Mr. King testified that neither Governor Blanton nor Mr. Allen ever expressly told Mr. King to approve or deny a license or transfer application or requested that Mr. King approve or deny a transfer application.

The plaintiff also called George Battle Malone Claiborne, an assistant director of the ABC in 1977. Mr. Claiborne testified that he was interviewed for the position of assistant director by the defendant, Mr. Allen, among others, although, at that time, Mr. Allen was no longer a member of the governor's staff. Claiborne testified that during the interview, Mr. Allen told him that the governor's office wanted to be kept informed of the activities of the ABC.

Mr. Claiborne also testified that about a month after he became the assistant director, sometime prior to the July 12, 1977, ABC meeting, he approached Mr. Allen about the applications for transfer which were to be considered at that meeting. Mr.

Claiborne testified that he couldn't remember whether he approached Mr. Allen of his own volition or whether Mr. Allen called him and asked him to come to his office. According to Mr. Claiborne, he went to Mr. Allen's office and asked Mr. Allen how he wanted the proposed transfers handled. Mr. Claiborne testified that Mr. Allen initially told him just to deny all the applications, but then, when Mr. Allen reviewed the applications individually, he instructed Mr. Claiborne to recommend approval of two of the transfer applications, one of which was the application of Jack Ham, and to deny the rest, one of which was the application of the store in which the plaintiff, Robert Bubis, allegedly had an interest. Mr. Claiborne testified that he made recommendations to the ABC based on the instructions he received from Mr. Allen.

On cross-examination, Mr. Claiborne testified that this was the only time while he was assistant director that he approached Mr. Allen and received Mr. Allen's recommendations regarding license and/or transfer applications. Mr. Claiborne further testified that he never provided any information about the activities of the ABC, other than those which were of public record, to the governor.

Robert Townes was also called as a witness for the plaintiff. Mr. Townes testified that he was Governor Blanton's patronage chief for Davidson County during his administration as governor. Mr. Townes testified that about six months before the ABC began to issue liquor licenses, while Mr. Allen was still special consultant to the governor, Mr. Allen offered to help Mr. Townes' wife and her partners get a liquor license if they would take in another partner, someone who had been a help to Governor Blanton in his campaign. Mr. Townes testified that Mr. Allen suggested S.J. King as a potential partner. Mr. Townes testified that he discussed the possibility with Mr. King and that Mr. King advised him that because he had a position with the ABC he could not hold an interest in the Townes' liquor store. Mr. Townes testified that Mr. King told him that Mr. Rollins might be interested in part owner-

ship in the Townes' store. Mr. Townes testified that Mr. Rollins became a 25 percent interest partner in the Townes' store. He also testified that although Mr. Rollins had an interest in the store, he did not put any capital into the store and did not participate in the day-to-day operations of the business. Mr. Townes further testified that Mr. Rollins' profit checks were sometimes given to Mr. Rollins directly but were also often given to Mr. King.

Bernard Weinstein, a Nashville architect, also testified for the plaintiff. Mr. Weinstein testified that Mr. Hood had approached him and asked him if he was interested in having a liquor license. Mr. Weinstein testified that, after he determined which area to apply in through further conversations with Mr. Hood, he applied for and received a liquor license. Mr. Weinstein also testified that shortly after he acquired his license, Mr. Allen approached him and suggested that he be allowed to manage Mr. Weinstein's store in return for a fee. Mr. Weinstein did not testify as to whether or not he ever entered into a consulting arrangement with Mr. Allen.

Robert O. Frensley, a Nashville car dealer, was also called on behalf of the plaintiff. Mr. Frensley testified that Mr. Hood and Jack Ham came to his car dealership sometime in 1975 to talk to him about applying for a liquor license. Mr. Frensley testified that Mr. Hood stated that they wanted friends of the administration to apply for liquor licenses. Mr. Frensley also testified that, during the conversation, Mr. Ham, who had been drinking heavily, advised him that a liquor license would cost 20 percent for "the man."

Mr. Frensley testified that he applied for and received a license for the Murfreesboro Road area. He also testified that soon after getting his license he discovered a consulting contract on his desk. Mr. Frensley testified that the contract provided that Mr. Allen would manage Mr. Frensley's store for 15 years in return for 30 percent of the store's profits. Mr. Frensley testified that under the contract he had no right to terminate the contract and no right to hire or fire employees. Mr. Frensley testified that he considered the agreement as a pay-off and felt that its terms were unfair. He testified that he contacted Mr. Hood, who suggested that he speak with Mr. Allen. Mr. Frensley testified that when he objected to the contract, Mr. Allen responded by saying something to the effect of, "You mean you don't want a license?" Mr. Frensley further testified that he and Mr. Allen renegotiated the contract. According to Mr. Frensley, the renegotiated contract provided Mr. Frensley with the right to terminate the contract and to hire and fire store employees. He further testified that in 1977 he paid Mr. Allen approximately $6,400.00 for services rendered and cancelled the contract.

Mr. Frensley testified that he had a conversation with Jack Ham during which he told Mr. Ham that a relative of his was interested in getting a liquor license in the Opryland Hotel. Mr. Frensley testified that Mr. Ham said that he had the only liquor license in the Donelson Pike area and that he paid 25 percent of his profits to insure that it stayed that way. Mr. Frensley further testified that Mr. Ham stated that "the man" wasn't going to get 25 percent of the profits from his store if anyone got a liquor license at the Opryland Hotel.

On cross-examination, Mr. Frensley testified that he went to see Governor Blanton about the proposed Opryland Hotel store and that the governor said that Frensley's relative should apply for the license and, if the ABC granted the license, it was alright with him. Mr. Frensley further testified that the application was granted and no payments were made to Mr. Ham or the Governor from the profits of the Opryland Hotel store.

On cross-examination, Mr. Frensley also testified that the services rendered by Mr. Allen were well worth the $6,400.00 he paid to Mr. Allen.

Sam Littleton, a radio station operator, also testified for the plaintiff. Mr. Littleton testified that he was interested in opening up a liquor store in the Opryland Hotel and that he spoke to Governor Blanton

about obtaining a liquor license. According to Littleton, Governor Blanton told him that he should go through the regular process to apply for a liquor license, but that he also needed to talk to the other license holders in the area because they might object to his application.

Edward Nelson, the president of Commerce Union Bank in 1976 and 1977, also testified for the plaintiff. Mr. Nelson testified that Mr. Allen approached him about obtaining a loan for a liquor store. Mr. Nelson further testified that during the course of the conversation, Mr. Allen told him that new applications for liquor licenses were going to be granted in Davidson County and that Mr. Allen could direct all, or substantially all, of the loan business to Commerce Union. Mr. Nelson testified that he declined Mr. Allen's offer because he did not want a concentration of loans in the liquor business.

Mr. Nelson also testified that in 1978 he had a conversation with Governor Blanton in which the governor inquired about a construction loan and identified Jack Ham as the proposed borrower. Mr. Nelson testified that Commerce Union Bank did make a loan to Jack Ham on the basis of his financial statement.

Mr. Nelson also testified about another conversation that he had with Governor Blanton in 1978, during which the governor discussed the liquidation of a personal loan which he had at Commerce Union Bank, and which was secured by his interest in an oil producing property. Mr. Nelson testified that Governor Blanton told him that he needed to get rid of the loan because the interest was "eating him up."

On cross-examination, Mr. Nelson testified that Mr. Allen was a member of the Board at the Mount Empire Bank, a subsidiary of Commerce Union Bank, and that as a Board member, Mr. Allen was encouraged to agressively seek business for the bank.

Mayor Richard Fulton also testified for the plaintiff. Mayor Fulton testified that in 1977 Mr. Allen and Mr. Ralph Waldo Emerson, Mr. Blanton's administrative assistant during his term in Congress, visited Mayor Fulton in his office and asked him whether he had any friends who wanted to be considered for liquor licenses. Mayor Fulton testified that he told Mr. Allen that he was opposed to the issuance of any more liquor licenses and that he did not want to have anything to do with the issuance of liquor licenses.

Defendant Blanton offered Mr. Carl Jones as a witness. Mr. Jones, a member of the ABC during Governor Blanton's administration, testified that he was not aware of any improprieties in the ABC during the Blanton administration. Mr. Jones further testified that he was never contacted by either Mr. Allen or Governor Blanton regarding the issuance or transfer of any liquor license.

Defendant Allen testified on his own behalf. Mr. Allen denied that he entered into an agreement with anyone to control the issuance or transfer of a liquor license. Mr. Allen further denied that he attempted to influence any member of the ABC with respect to the issuance or transfer of liquor licenses.

Mr. Allen testified that he has no recollection of being present at the meeting in Governor Blanton's office where the issuance of liquor licenses was discussed and where Mr. King suggested that Mayor Fulton be contacted. Mr. Allen testified that he called on Mayor Fulton at the request of the governor and that he discussed with Mayor Fulton policy issues regarding the issuance of liquor licenses. Mr. Allen denied asking Mayor Fulton if he had any friends who were interested in liquor licenses.

Mr. Allen further testified that his consulting contract with Robert Frensley was legitimate. Mr. Allen testified that his attorney drew up the original draft of the Frensley consulting contract and that if the contract was too one-sided before Frensley renegotiated it, it was his attorney's doing. Mr. Allen testified that Mr. Frensley received services worth the $6,400.00 Mr. Frensley paid him at the termination of the contract.

Mr. Allen denied offering to help Mrs. Townes get a liquor license if they would take in a partner. Mr. Allen testified that the Townes' license had already been issued when Mr. King called Mr. Allen and told him that he had a friend who was interested in having an interest in a liquor license. Mr. Allen testified that he then called Mr. Townes, told him about Mr. King's friend and suggested that if Mr. Townes was interested in a partner it could not hurt if that partner was a friend of Mr. King. Mr. Allen testified that this was the extent of his role with respect to the Townes' store.

Mr. Allen testified that Mr. Hood introduced Jack Ham to him. Mr. Allen testified that Mr. Ham said that he had heard that Mr. Allen was looking for a location for a liquor license in Green Hills or Belle Meade. Mr. Allen testified that he and Mr. Ham went to look at the location on Kenner Avenue for which Mr. Ham had an option and that Mr. Allen purchased the option from Mr. Ham for the same amount that he had paid for the option. Mr. Allen further testified that neither Mr. Hood nor Mr. Ham said anything to him about Governor Blanton's interest in Mr. Ham's store.

Mr. Allen denied that Mr. Claiborne ever came to his office for advice regarding the transfer of liquor licenses.

Mr. Allen also denied suggesting that Mr. Frensley would not get a license if he did not enter into the consulting contract and testified that Mr. Frensley must have misunderstood him.

Mr. Allen admitted that he complained to Governor Blanton about a license which was transferred to a location near the Allen store and competed with the Allen store for business. However, Mr. Allen testified that he objected to the transfer of the license because he believed that the license holder did not meet the statutory requirements for a transfer.

Finally, Mr. Allen testified that he had no part in the issuance of the license for the liquor store in which the plaintiff, Robert Bubis, allegedly had an interest and that he had no part in the denial of the transfer of that license.

## II.

In order to prevail under Section 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must establish that the defendants engaged in a contract, combination or conspiracy in unreasonable restraint of interstate trade or commerce. The plaintiff must show a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement. *American Tobacco v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Such a conspiracy can be shown by an explicit agreement or by a tacit understanding. *United States v. General Motors Co.*, 384 U.S. 127, 142–143, 86 S.Ct. 1321, 1329–30, 16 L.Ed.2d 415 (1966). The existence of an agreement may often be inferred from circumstantial evidence. *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658, (1969); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In order to show that an individual joined others in a conspiracy, there must be evidence that he, in some sense, promoted the venture and made it his own. *United States v. Falcone*, 109 F.2d 579, 581 (2nd Cir.) *aff'd* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

In this case, the evidence with respect to the defendant Blanton's involvement in a conspiracy in violation of 15 U.S.C. § 1, is abundant, clear, convincing and conclusive.

Jack Ham testified that he met with the defendant Blanton while he was governor and offered him a 20 percent interest in his two proposed liquor stores. Mr. Ham testified that Governor Blanton responded by saying something to the effect that it was "good politics" when a liquor license application was granted not to have other liquor stores competing in the same area. Mr. Ham testified that while Governor Blanton did not make an expressly affirmative reply to the proposal, he did not respond negatively or report the matter to the law enforcement authorities. Mr. Ham testi-

fied that it was his impression that he and Governor Blanton had reached an agreement.

S.J. King, the Chairman of the ABC, testified that Governor Blanton told him and Lee Hyden, that a person who was not a member of the ABC, identified as "Waldo," would determine who would be issued liquor licenses. As noted above, *see supra,* p. 1495, the Court finds that in taking this authority from the officers of the ABC, Mr. Blanton effectively took control of the ABC.

Jack Ham testified that when he wanted his liquor license transferred from Green Hills to Donelson Pike because other liquor stores were operating in the Green Hills area, he went to Governor Blanton to complain about the number of licenses issued for or transferred to the Green Hills area. Mr. Ham further testified that Governor Blanton asked Mr. Hood to arrange Mr. Ham's transfer. Mr. King testified that he voted to approve Mr. Ham's transfer because Mr. Hood told him that the transfer should be approved because the store was partially "the Chief's" and because Mr. Ham was "getting on" Governor Blanton. Mr. King also testified that Governor Blanton asked him to get Mr. Ham "off his back." Mr. King interpreted Governor Blanton's statement as an indication that he should approve Mr. Ham's transfer.

Sam Littleton testified that when he expressed an interest in operating a liquor store in the area in which Jack Ham's store was located, Governor Blanton indicated that he needed to get the approval of other liquor license holders in the area who might otherwise object to Mr. Littleton's application. Jack Ham testified that prior to the time any liquor licenses were issued, Governor Blanton informed Mr. Ham that another person, Mr. Shacklett, was interested in obtaining a license in an area which Mr. Ham was interested in obtaining a license and that Mr. Ham should discuss the Shacklett license with Mr. Gene Blanton. Mr. Ham also testified that on another occasion Governor Blanton told him that other people in the administration felt that

Mr. Ham should not be permitted to have two stores.

The defendant Blanton's conversations with Mr. Ham and Mr. King make it clear that while he was governor Mr. Blanton intervened directly and exercised control, at least to the extent to protect the interest of friends of the administration, over the issuance and transfer of licenses. Mr. Blanton's conversations with Mr. Littleton and Mr. Ham make it clear that the purpose of that control was to minimize the competition in the areas where certain liquor licenses were issued.

The evidence with respect to the defendant Allen's involvement in a conspiracy in violation of 15 U.S.C. § 1 is as follows.

Jack Ham testified that he and Mr. Hood met with Mr. Allen prior to the issuance of any liquor license and discussed liquor license locations. Mr. Ham testified that he and Mr. Allen were both interested in a Green Hills location. Mr. Ham testified that during that discussion either he or Mr. Hood advised Mr. Allen of his agreement to share 20 percent of his profits with Governor Blanton. Mr. Ham also testified that Mr. Allen told him that if he would give up his proposed Green Hills location he would not have to pay Governor Blanton 20 percent of his profits.

Mr. Claiborne testified that in his capacity as assistant director of the ABC he approached Mr. Allen in order to determine what recommendation he should make with respect to certain transfer applications. Mr. Claiborne testified that Mr. Allen first suggested that he deny all the applications and then, after reviewing the applications, suggested that he grant the transfer applications of Jack Ham and Wendell Pardue and deny the remainder of the transfer applications.

Mr. Robert Frensley testified that after he received his liquor license he found a consulting agreement on his desk which provided that Mr. Allen would provide consulting services for Mr. Frensley for 30 percent of Mr. Frensley's profits over a period of 15 years. Mr. Frensley testified that he was under the impression that the contract was a pay-off for the license but

that he felt that the terms were unfair. Mr. Frensley testified that when he approached Mr. Allen to renegotiate the contract, Mr. Allen said something to the effect of "Does this mean you don't want a liquor license?"

Robert Townes testified that Mr. Allen offered to help his wife obtain a liquor license if his wife and her partners would take S.J. King in as a partner. Mr. Townes testified that Charles Rollins, who became Mr. King's son-in-law, later became a partner in the Townes' store.

Mr. Allen's conversations with Messrs. Ham, Claiborne, Frensley and Townes make it clear that Mr. Allen played an important role in the control over the issuance of liquor licenses during the Blanton administration. Mr. Allen's conversation with Mr. Ham makes it clear that the purpose of such control was to minimize the competition in the areas of certain licenses.

Although Jack Ham is an admitted perjurer, having admitted to making several false statements under oath in his application for a liquor license, as well as a number of false statements made to the F.B.I. and the I.R.S., the Court credits the essence of his testimony in this action because much of his testimony was corroborated by other witnesses. Moreover, Mr. Ham has no interest in the outcome of this litigation. However, if it were not for the extensive corroboration of Mr. Ham's testimony, the Court would not credit his testimony. The Court is convinced that the oath to tell the truth has no real significance to Mr. Ham.

The Court finds that the defendants Leonard Ray Blanton and James M. Allen engaged in a conspiracy with one another and others to restrain or eliminate competition by allocating locations for liquor stores in order to insulate some stores from competition by other liquor licenses.

A conspiracy in restraint of trade is unlawful under 15 U.S.C. § 1 if it affects interstate commerce. *McLain v. Real Estate Board,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). In this case, the defendants stipulated that various

liquors flowed in interstate commerce in a continuous and an uninterrupted stream from manufacturers outside the State of Tennessee to wholesalers within the state who supplied these liquors to the defendants and/or their co-conspirators. In addition, among the stores which were protected by the conspiracy were stores in which the defendants Blanton and Allen, as well as some of their co-conspirators, had ownership interests. Arrangements among competitors to divide markets or otherwise control competition among them have been determined to be *per se* violations of Section 1 of the Sherman Act (15 U.S.C. § 1). *Addyston Pipe and Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

Therefore, the Court finds that the defendants Blanton and Allen, engaged in a conspiracy for the restraint of trade in violation of 15 U.S.C. § 1.

## III.

The plaintiff contends that he is entitled to damages in accordance with 15 U.S.C. § 15. Under 15 U.S.C. § 15, a person may recover damages if he was injured in his business or property as a result of conduct forbidden by the antitrust laws. 15 U.S.C. § 15 provides in pertinent part:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained and the cost of suit including a reasonable attorney's fee.

Therefore, in order for the plaintiff to have standing under 15 U.S.C. § 15, the plaintiff must be a person "injured in his business or property by reason of a violation of the antitrust laws."

In this case, the plaintiff, Mr. Robert Bubis, contends that he was injured by the conspiracy to control the issuance and transfer of liquor licenses in that the de-

fendants and their co-conspirators influenced the ABC to refuse to grant the plaintiff's application for a transfer of his license at Red & White Liquors on Eighth Avenue South, to a location near Old Hickory Boulevard and Nolensville Road in Nashville, Tennessee. The application for transfer of Red & White Liquors was filed with the ABC on April 20, 1977, and was denied on July 12, 1977.

However, the proof in this case fails to show any license for Red & White Liquors held by the plaintiff which could have been transferred. In fact, the records of the ABC show that the license for Red & White Liquors located at 501 Eighth Avenue South was issued to Shirley Ann Wise, as sole proprietor on April 1, 1977. The license expired by its own terms on December 31, 1977. The records of the ABC further show that there was no change in the ownership of the license between April 1, 1977, and December 31, 1977. As Mr. Bubis had no interest in the license for Red & White Liquors, he had no license which could have been transferred on July 12, 1977.

The plaintiff contends that, despite the fact that he did not have a liquor license for Red & White Liquors, he did, in fact, own an interest in the liquor store and that his business interest therein was damaged as a result of the conspiracy to control the issuance and transfer of liquor licenses. Both the plaintiff and Rodney Wise, the husband of Shirley Ann Wise, testified that Mr. Bubis acquired a partnership interest in Red & White Liquors when Mrs. Wise purchased the business. The plaintiff's contention is supported by the fact that he and Shirley Ann Wise made a joint application to transfer the liquor license for Red & White Liquors on April 20, 1977. However, the plaintiff's contention is contradicted by the fact that Shirley Ann Wise was the only purchaser on the contract to buy Red & White Liquors. The plaintiff's contention is also contradicted by the fact that when Shirley Ann Wise filed her application for a liquor license for Red & White Liquors she stated under oath that no one other than herself had "any kind of interest, financial, stock ownership, membership loans, gifts or security loans, made for carrying on the business" and that no one other than herself would share in the profits from the business. In addition, in the questionnaire signed under oath, Shirley Ann Wise stated that Red & White Liquors would be operated as a sole proprietorship. In further contradiction of the plaintiff's testimony regarding his interest in Red & White Liquors is his application for a retail liquor license for a store to be known as Hickory Plaza Liquor Store filed April 19, 1977. In that application, Robert Bubis stated under oath that the only other business in which he had an interest was Colonial Liquors in Berry Hill, Tennessee.

In any event, even if the plaintiff, Robert S. Bubis, did have an ownership interest in Red & White Liquors, his interest was illegal. Tenn.Code Ann. § 57–3–210(f) provides in pertinent part:

> It shall be unlawful for any person to have ownership interest in, or participate either directly or indirectly, in the profits of any wholesale or retail business licensed under this chapter, unless his interest in said business and the nature, extent and character thereof shall appear on the application; or if the interest is acquired after the issuance of a license, unless it shall be fully disclosed to the commission and approved by it.

Mr. Bubis' alleged interest in Red & White Liquors was not disclosed in Shirley Ann Wise's application for a liquor license, nor, if it was acquired after the issuance of the license, was it disclosed to and approved by the Commission.

As any interest the plaintiff may have had in Red & White Liquors was illegal, the plaintiff had no interest on July 12, 1977, which could have been transferred by the ABC.

### IV.

The Court finds the plaintiff, Robert Bubis, had no legitimate interest in Red & White's liquor license on July 12, 1977. The Court further finds that the plaintiff had no interest in Red & White Liquors which could be transferred by the ABC on

July 12, 1977. Therefore, the Court finds that the plaintiff does not have standing to make a claim under 15 U.S.C. § 15 on the basis that he was injured by the ABC's denial of the application of Red & White Liquors for a transfer to Old Hickory Boulevard and Nolensville Road. Accordingly, the Court finds in favor of the defendants, Leonard Ray Blanton and James M. Allen, and against the plaintiff, Robert Bubis. The plaintiff's claim is dismissed.

An appropriate order will be entered.